Patrick A. HIGGINS, Appellant,

v.

**MUNICIPALITY OF ANCHORAGE, Appellee.**

No. S–3417.

Supreme Court of Alaska.

April 26, 1991.

Peter J. Maassen, Burr, Pease & Kurtz, Anchorage, for appellant.

Richard L. McVeigh, Asst. Mun. Atty., Richard D. Kibby, Mun. Atty., Anchorage, for appellee.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

BURKE, Justice.

Patrick Higgins appeals from the denial of his motion for a new trial of his wrongful reclassification action against the Municipality of Anchorage, alleging that newly discovered evidence shows that the Municipality misrepresented its policy on the arbitrability of reclassification disputes. Treating his motion as a Rule 60 request for relief from an earlier judgment of this court, we grant the motion and remand for further proceedings.

### I

This case, arising out of the reclassification of Higgins's job and subsequent termination of his employment, came to us once before on a petition for review. *Municipality of Anchorage v. Higgins*, 754 P.2d 745 (Alaska 1988) (*Higgins I*). The underlying facts are set out there and need not be repeated here. *Id.* at 746. On review we "limited our consideration solely to the issue of whether the trial court erred in denying the [Municipality's] motion for summary judgment on the grounds that Higgins failed to exhaust his administrative-arbitration remedy." *Id.* at 746 n. 6.

The trial court had denied the municipality's affirmative defense that Higgins's claim was barred by his failure to exhaust administrative remedies. The trial court's reasoning was that exhaustion of the administrative remedy was unnecessary, because a grievance in this case would have been futile. The first two steps of the grievance procedure involved appeals to Higgins's immediate superior, Frank Austin, and to then-Mayor Tony Knowles, the individuals who reclassified Higgins in the first place.

We did not have to decide whether the first two steps of the grievance procedure would have been futile, because we accepted the municipality's argument that there was no showing or argument that the mandated third step of the procedure—binding arbitration before a neutral arbitrator— would also have been futile. *Id.* at 747–48. We concluded that "in light of the undis-puted availability of arbitration under the rules, we think it plain that the superior court erred in denying the municipality's exhaustion of remedies claim based upon the futility exception." *Id.* at 748. We therefore reversed the trial court's denial of summary judgment. *Id.*

Higgins argued in the alternative that the municipality was estopped from asserting an exhaustion of remedies defense, because Austin had represented to him that grievance of the reclassification was not available in his case. *Id.* After finding the record unclear as to whether a factual dispute existed concerning what Austin had said to Higgins, we remanded for reconsideration of the estoppel issue. *Id.* A bench trial was held on December 6, 1988. In a Memorandum Opinion and Judgment issued May 15, 1989, the superior court ruled that, "contrary to Higgins' claims, Frank Austin did not represent to him that he did not have the right to grieve the reclassification of his position." The court then dismissed Higgins's suit because of his failure to exhaust his administrative remedies.

On May 26, 1989, Higgins moved for a new trial based on new evidence. The new evidence consisted of an affidavit by a former municipal official to the effect that the municipality has consistently considered reclassification issues to be nongrievable and nonarbitrable. Higgins also directed the court's attention to pleadings the municipality made in a contemporaneous case in which the municipality adopted the position that a reclassification issue was not arbitrable. Higgins asserted that this evidence directly contradicted the testimony of Austin, on which the court had placed great reliance in making its decision. Higgins concluded that "[t]his evidence of misrepresentation would change the result of a new trial."

On August 4, 1989, the superior court denied the motion for a new trial on the grounds that "[t]he evidence offered does not appear to be newly discovered, and even if it was, it is not of a nature that it could not have been discovered before trial by due diligence." Higgins appeals to this court, contending that the superior court

abused its discretion in denying his motion for a new trial.

## II

When this case first came up for review, we specifically determined that the availability of arbitration was fatal to Higgins's argument concerning the futility of his administrative remedies. *Higgins I*, 754 P.2d at 747–48. Higgins now claims that although the municipality argued in *Higgins I* that arbitration was available, its longstanding policy has been that arbitration is not available to resolve reclassification disputes. We consider first whether there is an inconsistency in the municipality's position. Concluding that there is an inconsistency, we then discuss the consequences it has for the disposition of this case.

### A

■ According to Higgins, the essence of the municipality's position before this court in *Higgins I* was that arbitration was available as part of the grievance procedure. As evidence, he cites the argument headings of the municipality's brief to this court:

2. Under the Rules Higgins could have challenged the 1984 executive appointment by grievance.

3. Under the Rules Higgins could have compelled Anchorage to arbitrate the validity of the 1984 executive appointment.

4. Higgins would have had an unbiased arbitrator.

5. Anchorage would have paid the entire cost of arbitration.

. . . .

7. The employee's right to challenge an alleged violation of the Personnel Rules goes together with the employer's right to answer that challenge in an arbitration rather than in court.

8. Arbitration would save Higgins, Anchorage, and the Alaska courts from the burdens and expenses of litigation.

Higgins directs our attention to materials presented by the city to the superior court in two other cases.[1] Their essence is that since 1981 the municipality, in its own words, "has steadfastly refused all requests to arbitrate reclassification issues. Anchorage has maintained that reclassification issues are not substantively arbitrable." The *AMEA* cases concluded with a ruling by the superior court, just before Higgins's trial, that "the Municipality of Anchorage need not submit grievances associated with the above-captioned case to binding arbitration."

Higgins also presents an affidavit by John Alexander, former Labor Relations Manager for the municipality, which was submitted along with the motion for a new trial. Alexander, who worked under Frank Austin from 1983 to 1988, avers that

[d]uring the time I was employed by the Municipality in that position, it was my understanding that, as a matter of policy, issues involving reclassification of employees were not grievable or arbitrable. That was the consistent practice during the time I was employed by the Municipality and I understood that the Municipality had always maintained that position.

As Alexander understood it, reclassification "issues were not substantively arbitrable under either the Municipal Personnel Rules or the provisions of a collective bargaining agreement."[2]

The municipality seems to concede Higgins's primary substantive point—that it never considered arbitration appropriate in this case: "The City's position is now and has been since 1981 that reclassification matters are not arbitrable, but they are grievable and subject to administrative review." It stresses, however, the difference between "grievability" and "arbitrability,"

---

1. *Anchorage Municipal Employees Ass'n v. Municipality of Anchorage*, Case Nos. 3AN–86–5892 & 3AN–86–15174 (consolidated).

2. The *AMEA* cases were brought pursuant to a collective bargaining agreement, whereas Higgins, an unrepresented employee, brought his case pursuant to the Personnel Rules. The municipality does not dispute that its position on arbitrability is the same for the Personnel Rules as for collective bargaining agreements.

and emphasizes that its position on arbitrability "does not excuse [sic] or foreclose the right of the employee to seek administrative review of classification matters particularly when accompanied by a change in status." It is not clear whether the municipality means by this argument that the unavailability of *arbitration* does not excuse the failure to *grieve*, or that the unavailability of arbitration does not excuse the employee from attempting to arbitrate, and then testing the city's refusal to arbitrate in court.

Whatever the municipality actually means to say now, its current argument differs substantially from its argument to this court in *Higgins I.* There, it said, "Anchorage respectfully submits that now is the time and this is the proper case for a strong statement endorsing and upholding arbitration provisions. Whether an arbitration provision appears in a statute, ordinance, individual employment contract, or collective bargaining agreement, such a provision serves both public and individual interests." This passage, the conclusion of its entire argument, is quite different from saying that "Higgins has a duty to test our refusal to arbitrate before he has recourse to the courts," which is the most favorable reading one can give to its current arguments.

The municipality did not merely argue that arbitration was technically available under the Personnel Rules. Rather, it also made a policy argument that arbitration was a preferred means of resolving disputes like Higgins's: "What both the trial court and Higgins ignore is the strong public policy favoring arbitration provisions." This policy argument followed a detailed analysis of the Personnel Rules and relevant state statutes, the point of which was that "Higgins could have compelled arbitration of his claim that his 1984 executive appointment violated the Personnel Rules."[3] This line of argument does not square with the municipality's current statement that "[t]he City's position is now and has been since 1981 that reclassification matters are not arbitrable, but they are grievable and subject to administrative review." We would have taken a very different view of Higgins's futility argument had we known at the time of *Higgins I* that the city would in fact actively oppose arbitration and that the city had in fact successfully opposed arbitration in analogous cases.[4]

To the extent that the city's current argument is that Higgins had a duty to *grieve* even if *arbitration* was not available, it is beside the point. The trial court ruled that grieving was futile. Before this court, the city did not contest the futility of grieving.[5] Instead, it said at the very be-

3. The municipality reemphasized its position in its reply brief:

This court should hold that it was an abuse of discretion for the lower court to hold that because the first few steps of his administrative remedies might have been futile, Higgins need not use the independent *arbitration* portion of his remedies.

....

Finally, this court should hold that use of arbitration would advance the policies which support the exhaustion of administrative remedies rule.

At the very end of its reply brief, the municipality said, "When administrative remedies include fair and impartial arbitration, the court must support the administrative system of dispute resolution by insisting that arbitration be used before an action is brought to court."

4. *See Public Safety Employees Ass'n v. State*, 799 P.2d 315, 323 n. 17 (Alaska 1990) ("Unlike in *Higgins*, here there was evidence that recourse to arbitration would have been futile, because

Commissioner Sundberg's letter stated that the reclassified employees were not entitled to arbitrate under the PSEA–State Collective Bargaining Agreement."). "Commissioner Sundberg," like the mayor in Higgins's case, was the individual whose grievance decision would have been arbitrated.

5. The city did argue in passing that Austin never *told* Higgins that grieving would be futile. In finding that grieving would be futile, the judge never indicated that the finding was based on Higgins's contested assertion regarding Austin's statements. Rather, the finding was based on the point that the grievance would be to the individuals who made the decision in the first place, and thus would be *per se* futile: "My ruling on that issue is that it would be basically an exercise in futility for him to have grieved at that time. The decision maker, Mr. Austin, or the chain of command. What remedy did he have? It was to Austin, to the Mayor, was it not?" At that point the city began stressing the availability of neutral arbitration.

ginning of its argument that "[i]t may or may not have been futile to ask the mayor to change his mind, but the mayor was only one step in the process. The Rules provided a step beyond the mayor—arbitration." As already mentioned, the availability of arbitration was central to this court's holding in *Higgins I*, rendering moot the futility (or lack thereof) of the earlier steps in the grievance process. *See Higgins I*, 754 P.2d at 747–48.

## B

■ We have long held that "the granting or refusal of a request for a new trial rests in the sound discretion of the trial judge. This court will not overrule the trial judge in the exercise of his discretion except in exceptional circumstances and to prevent a miscarriage of justice." *Montgomery Ward v. Thomas*, 394 P.2d 774, 774–75 (Alaska 1964). We established in *Montgomery Ward* the test for determining whether newly discovered evidence required a new trial in a civil case:

> These requirements are that the evidence: (1) must be such as would probably change the result on a new trial; (2) must have been discovered since the trial; (3) must be of such a nature that it could not have been discovered before trial by due diligence; (4) must be material; (5) must not be merely cumulative or impeaching.

*Id.* at 776. After noting the requirements of this test, the superior court concluded, "The evidence offered does not appear to be newly discovered, and even if it was, it is not of a nature that it could not have been discovered before trial by due diligence." The court thus denied the motion for a new trial.

There do not seem to be any grounds for holding that the superior court abused its discretion in finding that the evidence either was not new or could have been discovered by due diligence. Even assuming that Higgins did not know what the policy was by virtue of his position as manager of the wage and classification division, any inquiry by his counsel concerning the futility of grievance and arbitration would have revealed the city's policy on these matters. Due diligence at least requires a party arguing the futility of arbitration to ask how many other individuals had arbitrated similar issues. Upon learning that the answer is zero, the next question would be *why* nobody had arbitrated similar issues. At that point the city would have an obligation to explain its policy on arbitrability.

Higgins argues that, even assuming a lack of due diligence on his part, the inconsistency in the city's position is so unjust as to require the superior court to grant a new trial. He cites a number of situations illustrating that the rules of procedure are flexible when the dictates of justice so require. He emphasizes that the trial judge has a duty to correct an injustice. Higgins concludes that the superior court "plainly err[ed]" in not granting a new trial to correct the injustice resulting from the city's inconsistency.

This argument begs the basic question of whether the trial judge abused his discretion in determining that there was not a manifest injustice in the first place. If the judge determined that not granting a new trial would work injustice, he would be under a duty to order a new trial. But that initial determination is within his discretion; he is not under a duty to find an injustice simply because a party alleges one.

Here the judge had adequate grounds to find that no injustice had been worked as against Higgins. Even given that the city misrepresented its position to this court, but for Higgins's lack of due diligence, the misrepresentation would have been discovered two years ago. By finding that the "newly discovered evidence" could have been previously discovered by exercise of due diligence, the judge implicitly held that any injustice suffered by Higgins was his own fault.

## III

■ The conclusion that the trial judge did not abuse his discretion in denying the motion for a new trial does not end

our inquiry, however. At some point, a misrepresentation to the court offends the integrity of the judicial system itself. Civil Rule 60, which provides for relief from judgment, specifically authorizes a court "to set aside a judgment for fraud upon the court." Alaska R.Civ.P. 60(b).

Higgins has not asserted this ground for reversing the trial court, but this court can certainly *protect the integrity of the judicial process sua sponte. Cf. Palzer v. Serv–U–Meat Co.*, 419 P.2d 201, 204 & n. 13 (Alaska 1966) (motion for rehearing on grant of summary judgment treated as Rule 60 motion). Furthermore, the trial judge did not exercise his discretion with regard to this consideration. The representations about arbitration were made to, and accepted by, this court. The trial on remand had nothing to do with whether arbitration was available; it focused on Higgins's estoppel argument concerning representations he claimed Frank Austin had made.[6] While the new evidence does not justify a new trial on the issue of estoppel, it clearly undermines the basis of this court's decision in *Higgins I*, which made the trial necessary in the first place.

We have held that "[t]o constitute fraud on the court under Rule 60(b), conduct must be so egregious that it involves a corruption of the judicial process." *Village of Chefornak v. Hooper Bay Construction Co.*, 758 P.2d 1266, 1271 (Alaska 1988). We have also noted with approval Wright and Miller's observation that fraud on the court applies " 'to very unusual cases involving far more than an injury to a single litigant.' " *Allen v. Bussell*, 558 P.2d 496, 500 (Alaska 1976) (quoting 11 C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2870, at 253 (1973)).

Despite the language in *Chefornak* and *Allen* emphasizing how exceptional conduct must be to find fraud on the court, precedent exists for considering the city's

action a corruption of the judicial process. In *Mallonee v. Grow*, 502 P.2d 432 (Alaska 1972), the party's counsel "participated in filing pleadings which grossly overstated the amount due, in levying on property not owned by the judgment debtor and in failing to serve notice on the motion to confirm sale." *Id.* at 438. In upholding the trial judge's finding that these actions constituted fraud on the court, we emphasized that " '[counsel's] loyalty to the court, as an officer thereof, demands integrity and honest dealing with the court. And when he departs from that standard in the conduct of a case he perpetrates a fraud on the court.' " *Id.* (quoting 7 J. Moore, *Moore's Federal Practice* ¶ 60.33, at 513 (1971)). We also held that actual intent to defraud is not required for fraud on the court to be present; "reckless disregard" of procedural safeguards is enough. *Id.*

By way of contrast to *Mallonee*, in *Allen* it was by no means clear that there was any misrepresentation at all. *Allen*, 558 P.2d at 500. Thus, we found no fraud on the court. *Id.* Similarly, in *Chefornak*, we agreed with the trial court that "[i]t is difficult to surmise what more could have been done" by the attorney to avoid any misrepresentation. *Chefornak*, 758 P.2d at 1271.[7] Here, however, the municipality was at least reckless in misrepresenting its policy on arbitration in *Higgins I*. It clearly violated its duty of honest dealing with this court; this case is thus closer to *Mallonee* than to *Allen* and *Chefornak*. We therefore conclude that our judgment in *Higgins I* should be set aside for fraud upon the court.

The superior court's original denial of the municipality's motion for summary judgment is REINSTATED and this case REMANDED for further proceedings.

---

6. One of Higgins's problems in moving for a new trial was his insistence that the importance of the new evidence lay in the doubts it cast on Austin's credibility. Newly discovered evidence that is merely impeaching cannot support a motion for a new trial. *Montgomery Ward*, 394 P.2d at 776.

7. The root of the problem in *Chefornak* was a language barrier between the attorney and his clients.