Hershell B. MURRAY, Appellant/Cross–Appellee,

v.

Rodney D. LEDBETTER and Katherine L. Ledbetter also known as Katherine L. Schlotfeldt, Appellees/Cross–Appellants.

Nos. S–11530, S–11609.

Supreme Court of Alaska.

Sept. 29, 2006.

---

Michael Jungreis, Hartig Rhodes Hoge & Lekisch, PC, Anchorage, for Appellant/Cross–Appellee.

Gregory R. Henrikson, Marc G. Wilhelm, and Marjorie K. Allard, Richmond & Quinn, Anchorage, for Appellees/Cross–Appellants.

Before: BRYNER, Chief Justice, MATTHEWS, FABE, and CARPENETI, Justices.

*OPINION*

BRYNER, Chief Justice.

## I. INTRODUCTION

Hershell Murray appeals a decision by the Alaska superior court that refused to enforce an Idaho judgment against Katherine Ledbetter because, in the court's view, the judgment had been obtained by fraud on the Idaho court and had thereby deprived Katherine of an opportunity to be heard. But the trial court did not find an intentional fraud or a reckless misrepresentation. Moreover, Murray was not involved in the misrepresentation. And the record shows that Katherine's failure to appear and defend in the Idaho action largely resulted from her own conscious decision not to participate in the case. Given these circumstances, we find that the alleged misrepresentation amounted, at most, to a wrong committed between the parties and was not sufficiently egregious to qualify as a fraud directed against the court. Accordingly, we reverse the superior court's judgment.

## II. FACTS

The dispute in this case traces its origins to the 1980s, when Rodney and Katherine Ledbetter, who were married at the time, participated in some business ventures with Hershell Murray. By the late 1980s their ventures went sour. In 1989 the Ledbetters applied for bankruptcy in the United States Bankruptcy Court for the District of Nevada. Murray filed a claim in the bankruptcy action, alleging that the Ledbetters owed him money that they had gained by engaging in fraud. The Ledbetters eventually settled the fraud claim with Murray, stipulating to give him notes that jointly and severally obliged them to pay Murray $500,000, plus interest, over five years. As part of the settlement, the Ledbetters also agreed to sign a confession of judgment acknowledging their liability to Murray for the amounts due under the note. The settlement agreement expressly provided that, if the Ledbetters defaulted on their obligation, Murray could sue for a judgment on their confession in any state where either Rodney or Katherine owned property or resided. The bankruptcy court approved the stipulation in 1990 and incorporated its terms in the order confirming the Ledbetters' reorganization plan.

The following year Katherine and Rodney divorced in the Idaho district court. Katherine was represented by a law firm from Ketchum, Idaho; Rodney was represented by another attorney from Ketchum, Roger Crist. In April 1991 the Idaho court issued a decree of divorce. The decree ordered Rodney to assume liability for most marital debts, and to hold Katherine harmless from any claims connected with those debts, including debts of the parties and claims relating to those debts listed in their 1989 bankruptcy proceedings.

In February 1992 Murray sued Rodney and Katherine in the Idaho district court, alleging that they had defaulted on their 1990 settlement agreement and seeking entry of a

judgment against them, jointly and severally, on their Nevada confession of judgment. Katherine received personal service of the summons and complaint for Murray's suit soon after the complaint was filed. On March 5, 1992, she wrote a letter to Murray's Idaho lawyer, Bradley Andrews, enclosing a copy of her recent divorce decree. Referring to the decree's provision in which Rodney assumed responsibility for all marital debt, Katherine demanded to be removed from the suit "immediately as is my legal right according to my divorce." She then added, "I look forward to your immediate response." In response, Andrews simply sent Katherine a copy of a letter that had recently been sent to Rodney by another of Murray's attorneys. The letter said that its purpose was "to confirm that we [Murray's attorneys] will give you and Katherine an extension until March 23, 1992 in which to file a response to the Motion for Judgment now pending in Blaine, Idaho." The letter also mentioned that Rodney had offered to settle the pending action by an agreement that would have allowed Murray to have the judgment he sought if Murray would agree not to execute on it, in return for which Rodney proposed to give Murray information on the whereabouts of a third party who was "trying to shelter" assets that could be collected to satisfy the judgment.

Upon receiving this response from Andrews, Katherine stopped by the office of Rodney's attorney, Roger Crist. Although she evidently did not meet with Crist, Katherine gave Crist's receptionist all the paperwork she had received concerning the recently filed lawsuit, including the original summons and complaint that had been served on her by the sheriff; her copy of the March 5 letter she had sent to Murray's attorney, Andrews; and the original letter that Andrews had sent Katherine in response, together with its attached copy of the earlier letter to Rodney.

According to Crist, he had been contacted by Rodney, who had asked Crist to file an appearance on Rodney and Katherine's behalf. Rodney had indicated that he wanted to delay the lawsuit and work out a compromise judgment. Rodney had also said that

Katherine was willing to go along with this approach. Based on his conversations with Rodney and the documents he received from Katherine, Crist thought that he had authority to represent Katherine. On March 23, he filed a notice of appearance in the lawsuit on behalf of both Rodney and Katherine.

In May 1993 Crist and Andrews agreed on a settlement. Under the settlement's terms, Rodney and Katherine would allow the Idaho court to enter judgment for Murray in the amount of the unpaid principal on their original obligation, as well as accrued interest, costs, and attorney's fees; they would also agree to a schedule for paying the judgment. In return, Murray would sign a covenant not to execute on the judgment as long as Rodney and Katherine stayed current on their payments. On June 9, 1993, in accordance with the settlement's terms, the Idaho court entered judgment against Rodney and Katherine, jointly and severally, for $650,064.82. Crist purported to represent both Rodney and Katherine in the settlement.

Meanwhile, after dropping the paperwork off at Crist's office in March 1992, Katherine had shown no further interest in Murray's suit: she made no attempt to participate in the litigation, never inquired about its status, and had no other contact with the court or the parties' counsel.

Katherine relocated to Anchorage in the summer of 1992. She remarried there and took the family name of Schlotfeldt in 1995. In June 1998 the Idaho district court renewed and extended the judgment against Rodney and Katherine for an additional five years. The judgment evidently remained unpaid.

In 2001 Murray filed the Idaho judgment with the superior court in Anchorage and served notice on Katherine that he sought to enforce it against her as an Alaska judgment. Katherine contested the judgment, alleging that it was unenforceable because she had never authorized Crist to represent her in the Idaho litigation.

The superior court held a hearing on Katherine's claim. At the hearing, Katherine initially seemed to question the validity of the original Nevada confession of judgment, as-

serting that the business dealings underlying that settlement had been between Murray and Rodney and that she knew little or nothing about them. Ultimately, however, Katherine focused her challenge on the Idaho litigation. She claimed that Crist's actions in negotiating a settlement on her behalf without her authorization amounted to a fraud on the Idaho court and rendered its judgment void. While asserting that she had never authorized Crist to represent her, Katherine gave conflicting testimony concerning the underlying facts. Although she acknowledged that she recalled giving Crist's receptionist her paperwork concerning the case, she claimed not to remember having been served with the summons and complaint, and she further claimed that she did not know that the Idaho case was still pending until she recently received notice that Murray had filed the Idaho judgment in Alaska. Katherine explained that she believed all along that her divorce decree made Rodney responsible for their obligation and gave her the right to be removed from any claims against Rodney.

In opposition to Katherine's testimony, Murray presented deposition testimony given by Crist. While Crist readily acknowledged that he had never personally spoken with Katherine about Murray's suit, he insisted that he had firmly believed, based on assurances given to him by Rodney and the paperwork Katherine had left at his office, that Katherine had wanted him to handle her case and was willing to agree to the settlement he ultimately negotiated for her and Rodney.

During closing arguments at the end of the hearing, Katherine's attorney argued that the Idaho judgment was the product of fraud on the court because Crist had entered into the stipulation without Katherine's consent after falsely leading the Idaho court to believe that he represented Katherine. This "critical lie," Katherine's counsel asserted, had led to the Idaho judgment. Insisting that the validity of the earlier Nevada judgment was not at issue, Katherine's attorney maintained that the key to the fraud was that Crist did not have authority to represent Katherine—regardless of whether he believed that he actually did.

Responding on Murray's behalf, Murray's counsel relied on Katherine's self-contradictory testimony and Crist's relatively straightforward account to argue that Katherine had actually authorized Crist to handle her case, or at least that Crist could have reasonably believed that she had consented. At worst, Murray's counsel alternatively argued, Crist's conduct did not amount to a fraud on the court. Emphasizing that Katherine had offered no evidence to prove that she did not actually owe Murray the amounts claimed in the Idaho judgment, Murray's counsel contended that the evidence failed to support a finding that Crist had acted with intent to defraud or that his conduct had caused any actual prejudice to Katherine. If Crist had done nothing on Katherine's behalf, Murray's counsel pointed out, the Idaho court would have entered a default judgment against her and no further notice to her would have been required under Idaho law.

After considering the evidence and the parties' arguments, Superior Court Judge Sen K. Tan issued a written decision concluding that the Idaho judgment was unenforceable because it had been obtained by a fraud on the Idaho court. Before reaching this conclusion, the judge made a number of specific findings adopting Murray's view as to many of the disputed facts. Specifically, the judge found that Katherine had been personally served with the Idaho summons and complaint and had thus received notice of the Idaho lawsuit. While noting that Katherine had been honestly mistaken in believing that she was not required to participate in the Idaho proceedings, the judge also found that she had no reason to expect that either Andrews or Crist would inform her of her misconception. And the judge further emphasized that the letter Katherine received from Andrews "did not in any way suggest that Ms. Schlotfeldt did not have to respond to the complaint." Moreover, the judge accepted Crist's testimony that, based on his conversations with Rodney and the documents he received from Katherine, he actually believed that he was authorized to represent Katherine. Finally, Judge Tan flatly rejected the notion that Murray might have been involved in any fraudulent conduct.

Despite these favorable findings, the court determined that Crist's conduct amounted to a fraud on the Idaho court because Crist had purported to represent Katherine under circumstances in which he "took his instructions from [Rodney], and at no time conferred with [Katherine]." Once Crist took responsibility for Katherine's representation, the court reasoned, he owed her a duty to inform her of her mistake. In the court's view, Crist's failure to do so had left Katherine out of the settlement and had thus "deprived her of meaningful participation in the case." Analogizing Katherine's situation to one in which the Ninth Circuit found that a fraud upon the court had been committed, the judge ruled that the Idaho judgment was unenforceable in Alaska because Katherine had "never had her day in court." [1]

Murray appeals.[2]

## III. DISCUSSION

In challenging the superior court's ruling, Murray argues that the record fails to support the superior court's conclusion that Crist represented Katherine without authorization. He further contends that, in any event, Crist's actions on behalf of Katherine caused her no harm and did not amount to fraud on the court under prevailing standards in either Idaho or Alaska. Given these circumstances, Murray insists that the superior court was required to give full faith and credit to the Idaho judgment.

Katherine responds that the policy against enforcing a judgment obtained by fraud on the court is universally recognized and was correctly applied here. Emphasizing that Alaska cases dealing with fraud on the court have not required a finding of specific intent to defraud, Katherine maintains that the superior court properly found that Crist committed a fraud on the Idaho court by reck-

lessly disregarding his professional duty to unambiguously secure her consent to be represented. Katherine further maintains that it is simply irrelevant to speculate as to what the Idaho court might have done in the absence of Crist's unauthorized actions.

### A. Applicable Law

The threshold question raised by these arguments is what law should apply in determining whether Crist's conduct amounted to a fraud on the court—Idaho's or Alaska's? Murray filed his superior court action against Katherine under Alaska's version of the Uniform Enforcement of Foreign Judgments Act.[3] The act allows any person having an out-of-state judgment to file an authenticated copy with the clerk of court in Alaska.[4] The clerk must then "treat the foreign judgment in the same manner as a domestic judgment." [5] This includes allowing the person against whom the foreign judgment is to be enforced to raise all the defenses that would be available against a similar Alaska judgment: "A judgment so filed has the same effect and is subject to the same procedures, defenses, and proceedings for reopening, vacating, or staying as a domestic judgment and may be enforced and satisfied in like manner." [6] Under the express terms of this provision, Alaska law would seemingly determine the availability of a defense to Murray's Idaho judgment. Yet because the specific defense at issue here involves a fraud allegedly committed in Idaho against an Idaho court, a strong argument could be made that Idaho law governing fraud on the court should determine whether Crist's conduct amounted to a fraud on that court.

Although the parties' briefing conflicts on this choice-of-law issue—Murray advancing Idaho law and Katherine citing Alaska law— we need not resolve the conflict, for we are

1. *Toscano v. Commissioner of Internal Revenue,* 441 F.2d 930 (9th Cir.1971).

2. Katherine also cross-appeals, challenging the superior court's denial of her motion for prevailing-party attorney's fees. Our decision reversing the superior court's decision declining to enforce the Idaho judgment based on fraud on the court makes it unnecessary to consider Katherine's cross-appeal.

3. AS 09.30.200–.270.

4. AS 09.30.200.

5. *Id.*

6. *Id.*

convinced that the law governing fraud on the court in both states dictates the same conclusion on the particular facts of this case.

## B. Fraud on the Court

As the United States Supreme Court observed in *Hazel–Atlas Glass Company v. Hartford–Empire Company,* the equitable doctrine of fraud on the court is a distinguishing feature of our common-law tradition:

> From the beginning there has existed along side the term rule a rule of equity to the effect that under certain circumstances, one of which is after-discovered fraud, relief will be granted against judgments regardless of the term of their entry. This equity rule, which was firmly established in English practice long before the foundation of our Republic, the courts have developed and fashioned to fulfill a universally recognized need for correcting injustices which, in certain instances, are deemed sufficiently gross to demand a departure from rigid adherence to the term rule. Out of deference to the deep rooted policy in favor of the repose of judgments entered during past terms, courts of equity have been cautious in exercising their power over such judgments. But where the occasion has demanded, where enforcement of the judgment is "manifestly unconscionable", they have wielded the power without hesitation.[7]

After recognizing that this common-law rule allowed relief when "after-discovered fraud" made "enforcement of the judgment ... 'manifestly unconscionable,' "[8] *Hazel–Atlas* went on to consider the rule's basic contours. Noting that a fraud on the court entails more than "simply a case of a judgment obtained with the aid of a witness who, on the basis of after-discovered evidence, is believed possibly to have been guilty of per-

jury," the Court suggested that a finding of fraud on the court required something like the case then before it: "a deliberately planned and carefully executed scheme to defraud not only the Patent Office but the Circuit Court of Appeals."[9] The Court further emphasized that, on the record before it, "[p]roof of the scheme, and of its complete success up to date, is conclusive."[10] The Court also observed that "no equities had intervened through transfer of the fraudulently procured patent or judgment to an innocent purchaser" and that the party seeking relief could not "have been expected to do more than it did to uncover the fraud."[11] The Court ultimately stressed that "[t]his matter does not concern only private parties. There are issues of great moment to the public in a patent suit.... [T]ampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society."[12]

■ In the sixty-plus years since the Supreme Court decided *Hazel–Atlas,* its description of the traditional equity rule has become broadly accepted as a definitive statement of the current form of the rule. The rule is now codified as part of Federal Rule of Civil Procedure 60(b), which spells out a limited number of grounds that parties may raise in seeking relief from a final judgment. Rule 60(b) includes a savings clause declaring that this list "does not limit the power of a court to entertain an independent action ... to set aside a judgment for fraud upon the court."[13] Alaska Rule of Civil Procedure 60(b) and Idaho Rule of Civil Procedure 60(b) also incorporate this savings clause.[14] Under all relevant formulations of

---

7. *Hazel–Atlas Glass Co. v. Hartford–Empire Co.,* 322 U.S. 238, 244–45, 64 S.Ct. 997, 88 L.Ed. 1250 (1944) (internal citations omitted).

8. *Id.* (quoting *Pickford v. Talbott,* 225 U.S. 651, 657, 32 S.Ct. 687, 56 L.Ed. 1240 (1912)).

9. *Id.* at 245.

10. *Id.* at 246, 64 S.Ct. 997.

11. *Id.*

12. *Id.*

13. Fed.R.Civ.P. 60(b).

14. The savings clauses of Alaska Rule of Civil Procedure 60(b) and Idaho Rule of Civil Procedure 60(b) both say that the rule "does not limit the power of a court to entertain an independent

this rule, the party claiming a fraud on the court bears the burden of proving the claim by clear and convincing evidence.[15]

### 1. Idaho law

Idaho cases applying Idaho Civil Rule 60(b) espouse *Hazel–Atlas's* strict definition of the elements necessary to prove fraud on the court. In *Campbell v. Kildew*, the Idaho Supreme Court recently identified "Idaho's principal case interpreting Rule 60(b)"[16] to be *Compton v. Compton*.[17] *Compton*, in turn, construed Idaho Rule 60(b)'s savings clause as preserving "preexisting means of attacking a final judgment."[18] In explaining this view, *Compton* traced the Idaho rule's meaning to *Hazel–Atlas*:

> The term "fraud upon the court" contemplates more than interparty misconduct, and, in Idaho, has been held to require more than perjury or misrepresentation by a party or witness, even where the misrepresentation was made to establish the court's jurisdiction. *Willis v. Willis*, 93 Idaho 261, 460 P.2d 396 (1969). Apparently such fraud will be found only in the presence of such "tampering with the administration of justice" as to suggest "a wrong against the institutions set up to protect and safeguard the public...." *Hazel–Atlas Glass Co. v. Hartford Empire Co.*, 322 U.S. 238, 246, 64 S.Ct. 997, 1001, 88 L.Ed. 1250, 1256 (1944) (fraud upon the court found where attorney for patent holder wrote article describing patent as unique, and arranged for publication in trade journal under name of ostensibly disinterested ex-

pert; court relied on article in reaching decision; construing identical language of F.R.C.P. 60(b)); 11 WRIGHT AND MILLER, FEDERAL PRACTICE AND PROCEDURE § 2870 (1973).[19]

In keeping with *Hazel–Atlas*, then, Idaho's view of Rule 60(b), as explained in *Compton*, requires fraud on the court to be based on clear and convincing proof of a fraudulent scheme directed against the court. Katherine cites no authority suggesting that Idaho takes a more expansive view of Rule 60(b)'s savings clause. Thus, under the superior court's findings in this case, Katherine's claim of fraud on the court would appear to be destined to fail under Idaho law. Here, the superior court declined to rule that Crist had engaged in a scheme to defraud Katherine or anyone else, expressly finding that he acted in the actual belief that he was authorized to represent Katherine. We think that Crist's good-faith, albeit unauthorized, efforts to represent Katherine could hardly be seen as "tampering" directed at the Idaho court, except perhaps in the attenuated sense that it involves simply a misrepresentation of facts "to establish the court's jurisdiction"—conduct that Idaho courts regard as ordinary fraud and refuse to treat as a fraud on the court.[20]

### 2. Alaska law

Katherine nonetheless argues that Crist's conduct amounted to a fraud on the courts under Alaska standards. Although we agree

---

action ... to set aside a judgment for fraud upon the court." This language is identical in all material respects to the savings clause language in Federal Rule of Civil Procedure 60(b).

**15.** *See McCall v. Coats*, 777 P.2d 655, 658 (Alaska 1989) (one who asserts that an adverse party has obtained a verdict through fraud, misrepresentation or other misconduct, including fraud on the court, has the burden of proving the assertion by clear and convincing evidence); *Campbell v. Kildew*, 141 Idaho 640, 115 P.3d 731, 740 (2005) (the party alleging fraud, including fraud on the court, bears the burden of proof by clear and convincing evidence that the judgment was obtained by fraud); *England v. Doyle*, 281 F.2d 304, 309–10 (9th Cir.1960) (the burden is on moving party to establish fraud on the court by clear and convincing evidence); 37 AM JUR.2D

*Fraud and Deceit* § 471 (2006) ("When it is alleged, each element of fraud must be established by clear and convincing evidence. The party alleging fraud bears the burden of proving it.").

**16.** *Campbell*, 115 P.3d at 739.

**17.** *Compton v. Compton*, 101 Idaho 328, 612 P.2d 1175, 1180 (1980).

**18.** *Id.*

**19.** *Id.* at 1181.

**20.** *Id.* (citing *Willis v. Willis*, 93 Idaho 261, 460 P.2d 396 (1969), for the proposition that perjury or misrepresentation to establish the court's jurisdiction does not by itself amount to fraud on the court).

that we have applied Alaska's Rule 60(b) savings clause somewhat more broadly than Idaho courts have applied their version of the rule, we cannot agree that Alaska's view of fraud on the courts is expansive enough to encompass the facts of this case.

Admittedly, we have previously noted that specific attempts "to define 'fraud on the court' are not particularly helpful." [21] But we have nevertheless consistently recognized that "[a] fraud upon the court may only be found in the most egregious circumstances 'involving a corruption of the judicial process itself.' " [22] We have also endorsed the views of commentators like Professors Wright and Miller, who observe in their treatise that the drafters of Rule 60(b) "must have conceived of 'fraud upon the court,' as they used that phrase, as referring to very unusual cases involving 'far more than an injury to a single litigant.' " [23] We have similarly favored the view that claims of relief from judgment for fraud must usually be decided under the procedural limitations spelled out in Rule 60(b)(3) or under Rule 60(b)'s other specifically listed categories. [24] And we have specifically rejected a claim of fraud on the court based on a party's failure to make "full and fair disclosure" of evidence regarding property value, ruling that the matter "was only between the two parties and did not involve a direct assault on the integrity of the judicial process." [25]

Of course, as Katherine correctly points out, we have also declined to hold that an intent to defraud must invariably be proved to establish a fraud on the court. On two separate occasions, we have ruled that a fraud on the court was shown even though the evidence did not prove a specific intent to defraud. In *Mallonee v. Grow*, we held that a judgment debtor and his attorney had perpetrated a fraud on the court by applying for an ex parte writ of execution that "grossly overstated" the amount that was actually owed, by using the writ to levy on property not owned by the judgment debtor, and by then failing to serve notice of the motion to confirm the property's sale. [26] While recognizing that "[t]here has been no showing of an actual intent to defraud," we insisted that "[t]he purposeful or reckless disregard of . . . procedural safeguards which results in the deprivation of substantive rights constitutes an impermissible corruption of the court process." [27]

In *Higgins v. Municipality of Anchorage* (*Higgins II* ), despite acknowledging our earlier rulings in *Village of Chefornak v. Hooper Bay Construction* and *Allen v. Bussell*, which "emphasiz[ed] how exceptional conduct must be to find fraud on the court," [28] we relied on *Mallonee v. Grow* to rule that a municipal attorney had perpetrated a fraud on the court by recklessly misrepresenting to this court the municipality's position in an administrative appeal.

Higgins had filed a wrongful discharge action in the superior court after the municipality terminated his employment; the supe-

---

**21.** *Allen v. Bussell*, 558 P.2d 496, 500 (Alaska 1976).

**22.** *Lowe v. Lowe*, 817 P.2d 453, 457 n. 9 (Alaska 1991) (quoting *Allen*, 558 P.2d at 500).

**23.** *See Allen*, 558 P.2d at 500 (approvingly quoting 11 CHARLES ALAN WRIGHT & ARTHUR A. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 2870, at 253 (1973)).

**24.** *See, e.g., Livingston v. Livingston*, 572 P.2d 79, 85 (Alaska 1977) (In reversing finding of fraud on court and remanding to consider granting relief under Rule 60(b)(6) instead, opinion quotes with approval Professor Moore's observation: "Fraud in obtaining jurisdiction may at times be a fraud upon the court. But appropriate relief can usually be afforded under other concepts of fraud; and better judicial administration will result in most cases if this species of fraud is not

put within the rather nebulous category of fraud upon the court. While fraud as to jurisdiction may improperly put the judicial machinery in operation, it usually does not corrupt the judicial power." 7 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 60.33, at 514–15 (2d ed.1975)).

**25.** *See O'Link v. O'Link*, 632 P.2d 225, 231 (Alaska 1981), *cited in Lowe*, 817 P.2d at 460.

**26.** *Mallonee v. Grow*, 502 P.2d 432, 438 (Alaska 1972).

**27.** *Id.* at 438–39.

**28.** *Higgins v. Municipality of Anchorage*, 810 P.2d 149, 154 (Alaska 1991) (*Higgins II* ) (citing *Village of Chefornak v. Hooper Bay Contr. Co.*, 758 P.2d 1266, 1271 (Alaska 1988), and *Allen*, 558 P.2d at 500).

rior court ruled that it would have been futile for Higgins to have attempted to exhaust his administrative remedies by asking for arbitration, because, according to Higgins, a supervisor had told him that the municipality would refuse any request to arbitrate his grievance.[29] The municipality petitioned for review and convinced this court, in *Municipality of Anchorage v. Higgins (Higgins I)*, to reverse the superior court's ruling on the ground that the record failed to support Higgins's claim that he had been told that the municipality would refuse to arbitrate.[30] In deciding *Higgins I*, however, we were unaware that the municipality's attorney had failed to disclose a longstanding municipal policy of refusing all requests to engage in grievance arbitration.[31] Higgins first discovered the existence of this policy after the superior court had dismissed his case on remand from our decision in *Higgins I*, so he moved seeking relief from judgment on the ground of newly discovered evidence.[32] The superior court denied his motion, ruling that Higgins could have discovered the policy sooner if he had acted with due diligence.[33]

In *Higgins II*, we upheld the superior court's finding that Higgins had not exercised due diligence in discovering the new evidence.[34] But we nonetheless ruled sua sponte that relief from judgment was warranted under Rule 60(b)'s savings clause because the municipality had perpetrated a fraud on this court in *Higgins I*.[35] We likened the municipality's conduct to the misrepresentation we considered in *Mallonee:* "Here . . . the municipality was at least reckless in misrepresenting its policy on arbitration in *Higgins I*. It clearly violated its duty of honest dealing with this court; this case is thus closer to *Mallonee* than to *Allen* and *Chefornak*. We therefore conclude that our judgment in *Higgins I* should be set aside for fraud upon this court."[36]

### 3. Distinguishing features of this case

Katherine insists that *Mallonee* and *Higgins II* support a finding of fraud on the court in her case because "[t]here can be no question that Mr. Crist acted in reckless disregard to the procedural safeguards that govern attorney client relationships and the integrity of the judicial process." Yet significant differences exist between Katherine's case, on the one hand, and *Mallonee* and *Higgins II*, on the other.

### a. Degree of misconduct

First, in both *Mallonee* and *Higgins II* we dealt with conduct that we expressly found to be reckless misrepresentation if not outright intentional fraud.[37] But despite Katherine's contention to the contrary, the superior court did not specifically find that Crist acted recklessly. The court here simply observed that, although Crist believed that he had been authorized to represent both Rodney and Katherine, he nonetheless took his instructions from Rodney, never consulted with Katherine, and did not actually have authority to represent Katherine. Unlike the express findings of reckless disregard, at best, in *Mallonee* and *Higgins II*, this determination seems more akin to a finding that Crist merely should have known that he lacked authority; in other words, that Crist acted negligently with respect to the question of his authority to represent Katherine.

Katherine seems to posit that Crist's conduct amounted to a reckless misrepresentation as a matter of law, for purposes of invoking Rule 60(b)'s savings clause, even if he actually believed that he was authorized to represent Katherine, and even though the court made no express finding of reckless

29. *Higgins II*, 810 P.2d at 150.

30. *See id.* at 151; *see also Municipality of Anchorage v. Higgins,* 754 P.2d 745 (Alaska 1988) (*Higgins I* ).

31. *Higgins II*, 810 P.2d at 151–52.

32. *Id.* at 150.

33. *Id.*

34. *Id.* at 153.

35. *Id.* at 154.

36. *Id.*

37. *See Mallonee,* 502 P.2d at 439; *Higgins II,* 810 P.2d at 154.

disregard. To support her position, Katherine cites various cases recognizing that attorneys cannot enter binding settlements without their clients' express consent. But none of these authorities applies Rule 60(b) or relies on a finding of fraud on the court.[38] Katherine also cites several cases holding that unauthorized representation made a judgment void and unenforceable. But with the exception of *Toscano v. Commissioner of Internal Revenue*,[39] which involved a deliberate scheme to avoid taxes by filing a fraudulent lawsuit against a defendant who lacked the ability to respond, none of these cases purported to apply Rule 60(b)'s savings clause or held that the conduct at issue was a fraud on the court.[40]

### b. Effect on outcome

Second, both *Mallonee* and *Higgins II* involved circumstances in which it was undisputed that the misrepresentation at issue had actually misled the court by causing it to issue a judgment that could not have been properly reached if the true facts had been

known.[41] Here, Katherine has failed to carry her burden of showing that comparable circumstances exist in her case.

Although Crist obviously misled the Idaho court concerning his actual authority to represent Katherine, it is far from clear that this misrepresentation caused the court to issue a judgment that it otherwise could not have issued. By the time Crist entered his appearance on Katherine's behalf, Katherine had been served with a summons and complaint in the case. Instead of entering an appearance herself and either answering the complaint or moving for dismissal, Katherine had simply written to Murray's lawyers, demanding that they dismiss her from the case. Her letter mistakenly asserted that, because her divorce settlement made Rodney solely responsible for the debt, Murray had no recourse against her and could only proceed against Rodney.[42] By Katherine's own account, she gave no further thought to the case after writing to Murray's attorney because, as far as she was concerned, the debt

---

**38.** *See, e.g., Musso v. Seiders,* 98 F.Supp.2d 197 (D.Conn.1999) (granting challenge to unauthorized settlement agreement on which no judgment had yet issued); *Saxton v. Splettstoezer,* 557 P.2d 1126 (Alaska 1976) (denying relief on direct appeal from judgment enforcing authorized settlement agreement); *Kimball v. First Nat'l Bank of Fairbanks,* 455 P.2d 894 (Alaska 1969) (affirming the setting aside of a settlement agreement because the attorney did not have authority to settle the claim); *Gray v. First Nat'l Bank,* 388 Ill. 124, 57 N.E.2d 363 (1944) (vacating for trial court lack of personal jurisdiction); *Leffler v. Bi–State Dev. Agency,* 612 S.W.2d 835 (Mo.App. 1981) (denying relief on direct appeal from judgment enforcing authorized settlement agreement).

**39.** *Toscano v. Commissioner of Internal Revenue,* 441 F.2d 930 (9th Cir.1971).

**40.** *See, e.g., Higbee v. Sentry Ins. Co.,* 253 F.3d 994 (7th Cir.2001) (relief under unspecified provision of Rule 60(b) based on lawyer's lack of authority to settle); *Fennell v. TLB Kent Co.,* 865 F.2d 498 (2d Cir.1989) (relief under Rule 60(b)(1)); *Pembroke State Bank v. Warnell,* 266 Ga. 819, 471 S.E.2d 187, 190 (1996) (granting relief on grounds unrelated to fraud); *Marx v. Fore,* 51 Mo. 69 (1872) (relief under general equity principles based on finding of ordinary fraud); *Parrillo v. Chalk,* 681 A.2d 916 (R.I.1996) (relief based on lawyer's lack of authority to settle).

**41.** *See Mallonee,* 502 P.2d at 439; *Higgins II,* 810 P.2d at 154.

**42.** The superior court recognized that Katherine's reliance on the provisions of her divorce decree was unjustified, and Katherine's briefing on appeal does not seriously dispute this finding. The proposition seems universally settled that a divorce decree incorporating an agreement between divorcing spouses does not affect the rights of third-party creditors. *See, e.g., Hanson v. Hanson,* 55 Wash.2d 884, 350 P.2d 859, 861 (1960) ("in a divorce action the court cannot adjudicate the rights of creditors who are not parties to the action"); *Community Guardian Bank v. Hamlin,* 182 Ariz. 627, 898 P.2d 1005, 1009 (App.1995) ("the court's allocation of community obligations does not affect the rights of third party creditors"); *In re Marriage of Waker,* 114 Or.App. 255, 834 P.2d 522 (1992) (other shareholders in corporation of which husband was shareholder were not parties to marriage dissolution proceeding and could not be bound by judgment to guarantee his payments to wife); *In re Marriage of Easterla,* 47 Or.App. 253, 613 P.2d 1100 (1980) (corporations were not parties to the divorce action, and no judgment or decree could be entered against them); *see generally* 15A AM.JUR.2D *Community Property* § 108 (2005) ("[g]enerally, both former spouses remain jointly liable for community obligations after their divorce").

was Rodney's problem, not hers. She was content to leave it at that.

Under these circumstances, even assuming that Crist had not entered his unauthorized appearance, Murray would have been entitled to obtain a default judgment against Katherine.[43] Although Katherine asserts that default proceedings might have given her further notice that her divorce decree had not completely eliminated her liability, Idaho law belies the assertion, providing that a default judgment could have been entered here without further notice to Katherine.[44] More to the point, the evidence provides no reason to suppose that Katherine would have responded to any additional notice, even if it had been given. The correspondence that Katherine received back from Murray's lawyers in response to her demand for dismissal gave her clear notice that Murray, even after being informed of the divorce decree, did not intend to drop his claim against her. Yet in spite of this notice, Katherine gave no further thought to the case, adhering to her view that the problem was Rodney's.

And in any event, Katherine has failed to meet her burden of showing any appreciable likelihood that she might have received an Idaho court judgment more favorable than the one the court actually entered. In the proceedings before the superior court, Katherine offered no evidence challenging the validity of the original Nevada bankruptcy judgment or the confession of judgment that Katherine executed as part of the settlement agreement incorporated in that judgment. Nor did Katherine dispute that the settlement agreement was in default when Murray filed his complaint in Idaho. So the record offers no basis for assuming that Katherine could have avoided being held jointly and severally liable for the unpaid debt due under the Nevada confession if she had appeared and contested the Idaho case.

If Katherine had appeared and defended, then, she presumably would have faced the possibility of a judgment allowing immediate execution against her for the amount of the unpaid debt, plus updated interest and Murray's attorney's fees. Compared to that outcome, Crist's negotiated settlement did markedly better: it left Katherine liable for the amount of the unpaid debt, plus interest and Murray's fees, but it buffered Katherine against immediate execution by giving her around three more months to make good on the payments (or to force Rodney to make good on the payments), due to the covenant not to execute on the judgment if she complied with this schedule.

### c. Party securing unfair advantage

The third important point of distinction between the circumstances in *Mallonee* and *Higgins II* and those at issue here is that in both of the earlier cases the party who committed the misrepresentation (or the party represented by the attorney committing the misrepresentation) sought to enforce the judgment procured by the misrepresentation to the obvious detriment of the party against whom the judgment was issued. Thus, in effect, the offending party affirmatively used the power of the court to secure an unfair advantage over an innocent opponent. In *Mallonee*, the judgment creditor not only obtained an inflated judgment for execution, he then used that judgment to execute against the judgment creditor in a blatantly improper way.[45] Similarly, in *Higgins II*, the municipality relied on a misrepresentation to obtain an appellate decision (*Higgins I*) reversing the superior court's initial ruling

---

**43.** In relevant part, Idaho Rule of Civil Procedure 55(a)(1) states: "When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules and that fact is made to appear by affidavit or otherwise, the court shall order entry of default against the party."

**44.** Idaho Rule of Civil Procedure 5(a) says that "no service need be made on parties in default for failure to appear." Idaho cases confirm that no notice of an entry of default is required if a party fails to plead or otherwise defend, as Kath-

erine undisputedly failed to do here. *See, e.g., Phillips v. Miles*, 116 Idaho 842, 780 P.2d 593, 594–95 (1989); *Olson v. Kirkham*, 111 Idaho 34, 720 P.2d 217, 220 (App.1986). Alaska's law accords with Idaho's on this point. *See, e.g., Snyder v. American Legion Spenard Post No. 28*, 119 P.3d 996, 1001 (Alaska 2005); Alaska R. Civ. P. 55(c)(1) ("if [a] party fails to appear for trial ... the court may proceed ex parte upon any motion for default or default judgment").

**45.** *Mallonee*, 502 P.2d at 438–39.

in Higgins's favor; on remand, the municipality then used the improvidently issued opinion in *Higgins I* as the primary basis for convincing the superior court to dismiss Higgins's case.[46]

It is this aspect of *Mallonee* and *Higgins II*—the misrepresenting party's affirmative use of the improperly secured judgment against the party damaged by the misrepresentation—that elevated the conduct in each case from a matter of ordinary fraud between the parties, a private concern, to a fraud directed against the court itself. Granting relief became necessary as a matter of equity to avoid the "manifestly unconscionable" result of allowing the defrauding party to use the court as an instrument of power against an opponent.

Here, by contrast, the misrepresentation was committed by Crist, who was not a party to the Idaho action. Nor was he an attorney who represented the party who is seeking to enforce the Idaho judgment. Crist represented Rodney in that action. But it is Murray, not Crist or Rodney, who now seeks to enforce the Idaho judgment against Katherine.

#### 4. The balance of equities

Katherine has neither alleged nor established that Murray played any role in Crist's misrepresentation. And she makes no attempt on appeal to explain how equity would be served by shifting the consequences of Crist's actions from her to Murray—a party who, unlike Katherine, apparently pursued his case by diligently complying with all applicable procedural rules. On appeal, Katherine insists that such equitable considerations are simply irrelevant; according to Katherine, they should play no role in determining whether Crist's conduct amounted to a fraud on the court.

Yet Katherine's argument disregards the source of the court's power to grant relief from a judgment obtained by fraud on the

court: it is a power born from common law traditions of equity; it is an equity rule "developed and fashioned to fulfill a universally recognized need for correcting injustices ... deemed sufficiently gross to demand a departure from rigid adherence to the term rule" in those rare situations "where enforcement of the judgment is 'manifestly unconscionable.'"[47] In *Mallonee v. Grow*, we qualified our decision to excuse Grow's lengthy delay in moving to set aside Mallonee's fraudulently obtained judgment by expressly noting that "there has been no reliance upon the judgment or order by anyone other than by the party who perpetrated the fraud on the court."[48] The same cannot be said here.

As the party claiming fraud on the court, Katherine bore the burden of proving by clear and convincing evidence that an order relieving her from the Idaho judgment—a judgment resulting from Katherine's own knowing decision not to contest the Idaho action—would avoid saddling Murray with a manifestly inequitable result by depriving Murray of his settled right to rely on the Idaho judgment. Katherine has failed to meet this burden.

#### 5. Sufficiency of findings

We recognize that the superior court's decision to grant relief from judgment on the ground that Crist committed a fraud on the court is reviewable only for abuse of discretion.[49] The superior court expressly recognized that "the fraud alleged in this case is not fraud by Mr. Murray, the party seeking to enforce the judgment." The court nonetheless granted relief based on Crist's representation of Katherine because Crist "took his instructions from [Rodney], and at no time conferred with [Katherine]." In the court's view, this "barred her from receiving any information on the case after Mr. Crist entered an appearance on her behalf," and therefore "deprived her of meaningful participation in the case."[50]

---

46. *Higgins II,* 810 P.2d at 154.

47. *See Hazel–Atlas Glass Co.,* 322 U.S. at 244–45, 64 S.Ct. 997 (citation omitted).

48. *Mallonee,* 502 P.2d at 437.

49. *Id.* at 439.

50. In reaching this conclusion, the superior court relied mainly on the Ninth Circuit's decision in *Toscano v. Commissioner of Internal Revenue,* 441 F.2d 930 (9th Cir.1971). But as already

But as we noted above, the superior court did not specifically find that Crist had acted recklessly or with intent to defraud. To infer a tacit finding of recklessness, moreover, would seem incompatible with the court's express acceptance of Crist's testimony that he concluded, based on Rodney's communications and the papers that Katherine left at his office, that he had been authorized to represent Katherine. And the record fails to support the trial court's finding that Crist's conduct "barred [Katherine] from receiving any information on the case." Undisputed evidence shows instead that Katherine stopped receiving information regarding the Idaho litigation largely because she knowingly, albeit inadvisedly, chose to ignore the case. Last, despite recognizing that Murray had no involvement in Crist's misconduct, the superior court declined to consider the offsetting equities from Murray's perspective—a necessary consideration because fraud on the court is a rule grounded in equity.

Considering the totality of these circumstances, we think that this case falls squarely within the ambit of earlier cases in which we have concluded that "nondisclosure by a party or his attorney has not been enough" [51] to support a finding of fraud on the court, and that "the wrong, if wrong there was, was only between the parties in the case and involved no direct assault on the integrity of the judicial process." [52] In analogous cases of this kind, we have required the aggrieved party to seek relief under the more demanding procedural framework that governs spe-cifically listed provisions of Rule 60(b). [53] Accordingly, we conclude that it was an abuse of discretion to find that Crist's conduct amounted to a fraud on the court. [54]

## IV. CONCLUSION

Because Katherine advances no other ground for relief from the Idaho judgment, [55] we REVERSE the superior court's ruling.

EASTAUGH, Justice, not participating.

---

indicated, *see* above, *Toscano* is inapposite: it involved convincing evidence of an elaborate, ongoing, and intentional scheme to avoid taxes by falsely claiming a marriage and fraudulently seeking a divorce from a party who had no notice of the fraudulent action. *Id.* at 931.

**51.** *O'Link,* 632 P.2d at 230.

**52.** *Livingston,* 572 P.2d at 82 (holding in custody modification action where mother and her counsel improperly served the father by publication and failed to disclose that the child was currently living outside the state with her father—a fact relevant both to the child's best interests and the court's jurisdiction—that relief could be granted under Rule 60(b)(6) but that the case involved wrong between the parties and did not amount to a fraud on the courts in large part because the father had independently learned of the pending custody action and had simply chosen not to appear in the modification proceedings).

**53.** *See id.* at 83–85.

**54.** Our decision makes it unnecessary to consider Murray's alternative claim that the superior court's ruling violated the United States Constitution's Full Faith and Credit Clause.

**55.** We emphasize that our ruling addresses only Katherine's challenge to the 1993 Idaho judgment. Because Katherine has disclaimed any attempt to challenge the underlying Nevada confession of judgment and has advanced no ground for challenging the Idaho court's renewal of the 1993 judgment, we have no occasion to address these issues.