*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| ALASKA FUR GALLERY, INC., HERNANDEZ and ASSOCIATES, LLC, and THE INN AT WHITTIER, LLC, | Supreme Court No. S-14856/14875 |
| Appellants and Cross-Appellees, | Superior Court No. 3AN-06-06120 CI |
| v. | O P I N I O N |
| FIRST NATIONAL BANK ALASKA (formerly First National Bank of Anchorage), | No. 6986 – March 13, 2015 |
| Appellee and Cross-Appellant. | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Stephanie E. Joannides and Patrick J. McKay, Judges.

Appearances: Don C. Bauermeister, Burke & Bauermeister, P.L.L.C., Bremerton, Washington, for Appellants and Cross-Appellees. William Grant Callow, II, Anchorage, and Stephen M. Dodge, Austin, Texas, for Appellee and Cross-Appellant.

Before: Stowers and Bolger, Justices, and Eastaugh, Senior Justice.[*] [Fabe, Chief Justice, Winfree and Maassen, Justices, not participating.]

BOLGER, Justice.

---

[*]     Sitting by assignment made under article IV, section 11 of the Alaska Constitution and Alaska Administrative Rule 23(a).

## I.    INTRODUCTION

A family of business owners obtained a bank loan to invest in a fledgling hotel project. The family later sued the bank, alleging that one of its loan officers fraudulently induced them to invest in the project. This appeal concerns numerous aspects of the resulting superior court proceedings. In particular, the family claims that the bank committed a fraud upon the court through inaccurate and inconsistent portrayals of the loan officer's conduct. We conclude that although some testimony offered by the bank may have been misleading, it was not sufficiently egregious as to constitute fraud upon the court. We therefore affirm.

## II.    FACTS AND PROCEEDINGS

William McGrew, now deceased, was a loan officer and the senior vice president for commercial lending at First National Bank Alaska (the Bank). Among the Bank's corporate customers were Alaska Fur Gallery, Inc. and Hernandez & Associates, LLC. Both entities are owned and operated by members of the Hernandez family, and we refer to these entities collectively as "the Hernandezes" unless context requires otherwise.

The Hernandezes borrowed money from the Bank to invest in a hotel project, the Inn at Whittier, LLC (the Inn). But according to the Hernandezes, McGrew used his position of trust to induce unwise investments in the Inn and, when trouble arose, assured the Hernandezes that he would relieve them of their financial liability by finding replacement financing, which never came to fruition. The Hernandezes filed suit, alleging both common law tort claims and Alaska Securities Act[1] violations.

The case was originally tried in 2008, but for reasons not relevant to this appeal, the superior court ordered a new trial. This second trial, conducted in 2010,

---

[1]    AS 45.55.010-.55.995.

resulted in an award for the Hernandezes on their common law negligence claim only. The jury found that the Hernandezes had suffered $675,000 in damages but determined that the Bank was only partially at fault. The jury concluded that another investor, Edward Cronick, also contributed to the Hernandezes' loss, and that the Hernandezes themselves were negligent and unreasonably failed to avoid damages. The jury allocated 45% of the fault to the Hernandezes, 41% to Cronick, and 14% to the Bank.

Based on the jury's verdict, the superior court entered judgment against the Bank in the amount of $94,500 in damages, plus interest. The court also awarded the Hernandezes attorney's fees and costs. The Hernandezes' appeal and the Bank's cross-appeal involve multiple rulings at various stages of the superior court proceedings. These specific rulings and the underlying facts are detailed in the discussion below.

## III. STANDARD OF REVIEW

A superior court's determination as to whether fraud upon the court has occurred is reviewed for abuse of discretion.[2] "In reviewing the denial of a motion for directed verdict or [judgment notwithstanding the verdict (JNOV)], we apply an objective test to determine whether the evidence, when viewed in the light most favorable to the non-moving party, is such that reasonable [persons] could not differ in their judgment."[3] "We review denial of a new trial under an abuse of discretion standard

---

[2]    *Mallonee v. Grow*, 502 P.2d 432, 439 (Alaska 1972) (citing *Erick Rios Bridoux v. E. Air Lines*, 214 F.2d 207, 207-10 (D.C. Cir. 1954)).

[3]    *Turner v. Municipality of Anchorage*, 171 P.3d 180, 185 (Alaska 2007) (quoting *Wal-Mart, Inc. v. Stewart*, 990 P.2d 626, 631-32 (Alaska 1999)) (internal quotation marks omitted).

wherein we disturb the trial court's discretion only in the most exceptional circumstances to prevent a miscarriage of justice."[4]

A superior court's decision to admit or exclude evidence is reviewed for abuse of discretion, and "will be upset only if we find there has been an error which affected the substantial rights of a party."[5] "We review jury instructions de novo when a timely objection is made."[6] Absent a timely objection, we review only for plain error.[7] Whether equitable estoppel applies is a question of law that this court reviews de novo.[8]

"We review the decision to award attorney's fees for abuse of discretion and [will] overturn it only where the award is manifestly unreasonable."[9] Here, the Bank asks for de novo review of the Hernandezes' enhanced attorney's fees award since the judge who made that award had not been present at the two trials. The Bank argues that since the awarding judge did not have the benefit of observing the proceedings, the rationale for the more deferential standard of review does not apply.[10]

---

[4]     *Id.* (second alteration in original) (quoting *Bierria v. Dickinson Mfg. Co.*, 36 P.3d 654, 656 (Alaska 2001)) (internal quotation marks omitted).

[5]     *Cartee v. Cartee*, 239 P.3d 707, 712 (Alaska 2010) (citing *Dobos v. Ingersoll*, 9 P.3d 1020, 1023 (Alaska 2000)).

[6]     *Cummins, Inc. v. Nelson*, 115 P.3d 536, 541 (Alaska 2005) (citing *Reich v. Cominco Alaska, Inc.*, 56 P.3d 18, 25 (Alaska 2002)).

[7]     *Id.* (citing *Manes v. Coats*, 941 P.2d 120, 125 (Alaska 1997)).

[8]     *Ogar v. City of Haines*, 51 P.3d 333, 335 (Alaska 2002) (citing *Hubbard v. Hubbard*, 44 P.3d 153, 155 (Alaska 2002)).

[9]     *Williams v. GEICO Cas. Co.*, 301 P.3d 1220, 1225 (Alaska 2013) (citing *DeNardo v. Cutler*, 167 P.3d 674, 677-78 (Alaska 2007)).

[10]     *See, e.g.*, *Valdez Fisheries Dev. Ass'n, Inc. v. Froines*, 217 P.3d 830, 833 (continued...)

We have never reviewed an award of attorney's fees with less deference where a new superior court judge has been assigned to a case, and we decline to do so here. Alaska Civil Rule 82(b)(3) gives the superior court significant discretion to "vary an attorney's fee award" based on the consideration of various factors, and makes no distinction between a judge sitting at trial versus a judge later assigned to a matter. Even a superior court judge who did not preside over the trial in a case may have a more current perspective through which to evaluate some of the Rule 82(b)(3) factors, such as "the reasonableness of the attorneys' hourly rates and the number of hours expended"; "the reasonableness of the number of attorneys used"; or an attorney's "efforts to minimize fees."[11] We therefore review the award of enhanced attorney's fees to the Hernandezes for abuse of discretion.

A superior court's prevailing party determination for purposes of attorney's fees is similarly reviewed for abuse of discretion.[12] Whether an offer of judgment complies with Alaska Civil Rule 68, however, is a question of law to which we apply

---

[10]     (...continued)
(Alaska 2009) ("The purpose of conferring discretion on the trial court to determine reasonable actual attorney's fees is to allow it to use its greater familiarity with the details of the case to perform an objective inquiry into these questions [of reasonable litigation expenses] and their like." (internal quotation marks omitted)).

[11]     Alaska R. Civ. Pr. 82(b)(3)(C)-(E).

[12]     *Progressive Corp. v. Peter ex rel. Peter*, 195 P.3d 1083, 1092 (Alaska 2008) (citing *Interior Cabaret, Hotel, Rest. & Retailers Ass'n v. Fairbanks N. Star Borough*, 135 P.3d 1000, 1002 (Alaska 2006)).

independent judgment.[13]  Similarly, we interpret the civil rules de novo,[14] and apply our independent judgment to the interpretation of contracts.[15]

## IV.    DISCUSSION

### A.    Although The Bank's Litigation Conduct Supports The Award Of Enhanced Attorney's Fees For The First Trial, The Superior Court Did Not Err By Finding No Fraud Upon The Court.

Before the second trial in this case commenced, the Hernandezes filed a motion seeking to establish the Bank's liability on the grounds that the Bank perpetrated a "fraud upon the court" during the first trial.[16]  The Hernandezes argued that Bank officers, despite their knowledge that McGrew had in fact violated bank policy and may have violated federal or state laws, presented testimony and "directed a litigation defense" based on the claim that McGrew had never committed any wrongdoing.  As evidence, the Hernandezes pointed to alleged inconsistencies between the Bank's testimony in their case (*AFG*) and a separate case involving McGrew's conduct with respect to a different Bank client, Todd Christianson (*Christianson*).[17]

---

[13]    *Anderson v. Alyeska Pipeline Serv. Co.*, 234 P.3d 1282, 1286 (Alaska 2010) (citing *Ellison v. Plumbers & Steam Fitters Union Local 375*, 118 P.3d 1070, 1073-74 (Alaska 2005)).

[14]    *Ford v. Municipality of Anchorage*, 813 P.2d 654, 655 (Alaska 1991).

[15]    *Casey v. Semco Energy, Inc.*, 92 P.3d 379, 382 (Alaska 2004) (citing *Old Harbor Native Corp. v. Afognak Joint Venture*, 30 P.3d 101, 104 (Alaska 2001)).

[16]    The Hernandezes' motion sought a finding of "Contempt Upon This Court (Similar To Fraud Upon the Court)," which the superior court analyzed under Alaska's "fraud upon the court" law.  The Hernandezes do not appear to dispute this interpretation.

[17]    *See Christianson v. First Nat'l Bank Alaska*, Mem. Op. & J. No. 1445, 2012 WL 6062124 (Alaska Dec. 5, 2012).

The superior court concluded that the Hernandezes "failed to demonstrate, by clear and convincing evidence, conduct by [the Bank] egregious enough to support a finding of fraud upon the court." The court also noted that the verdict from the first trial had already been vacated; thus the Hernandezes would have an opportunity at the second trial to "examine the bank officers about their knowledge of McGrew's conduct." Finally, the order made clear that the Hernandezes could later seek attorney's fees incurred during the first trial if they could "show new evidence elucidated at the upcoming trial that [would] justify a finding of misconduct by [the Bank] or fraud upon the court."

Upon conclusion of the second trial, the Hernandezes filed a renewed fraud upon the court motion, which was similarly denied. However, the superior court noted it would "consider the actions of the defense and their witnesses in conjunction with the anticipated motion for attorney's fees," and the court ultimately awarded the Hernandezes enhanced fees for hours spent on the first trial and on the motion for a new trial. The court found that the Bank's "litigation conduct prior to the first trial was not undertaken in good faith and, at times, was unreasonable" and that "testimony given in the *Christianson* matter was at odds with testimony presented in this litigation." But with regard to the second trial, the court found that the Hernandezes were able to present "whatever evidence [they] deemed relevant and probative" and that no enhanced fees were warranted. The Bank appeals the award of enhanced attorney's fees for the first trial,[18] and the Hernandezes contend that enhanced fees should have been awarded for both trials.

---

[18] The Bank raises additional issues regarding attorney's fees and costs that are unrelated to its alleged litigation conduct. These are addressed separately in subpart IV.G.

The Hernandezes also appeal the denial of their fraud upon the court motions and further contend the Bank has committed a fraud upon *this* court. A typical remedy for fraud upon the court is to vacate the fraudulently obtained judgment.[19] Here, however, the Hernandezes seek an alternative remedy, which is for this court to direct judgment in their favor and remand solely for determination of damages.

### 1. Fraud upon the court may only be found in the most egregious circumstances involving the corruption of the judicial process.

"Fraud upon the court" is an equitable doctrine that allows a court to set aside a judgment obtained as a result of fraudulent conduct.[20] It is an exception to the general rule that courts "[will] not alter or set aside their judgments after the expiration of the term at which the judgments were finally entered."[21] In Alaska, the doctrine is codified in Alaska Civil Rule 60(b), whereby a court has the power "to set aside a judgment for fraud upon the court."[22] "[T]he party claiming a fraud on the court bears the burden of proving the claim by clear and convincing evidence."[23]

---

[19]    *See* Alaska R. Civ. P. 60(b); *see also Higgins v. Municipality of Anchorage*, 810 P.2d 149, 154 (Alaska 1991) (concluding that this court's prior judgment "should be set aside for fraud upon the court"); *Mallonee v. Grow*, 502 P.2d 432, 440 (Alaska 1972) (affirming a superior court's decision to set aside its prior order based on a finding of fraud upon the court).

[20]    *Murray v. Ledbetter*, 144 P.3d 492, 497 (Alaska 2006) (citing *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 244-45 (1944)).

[21]    *Hazel-Atlas Glass Co.*, 322 U.S. at 244.

[22]    *See Murray*, 144 P.3d at 497.

[23]    *Id.* at 498.

We have noted that "specific attempts to define fraud on the court are not particularly helpful,"[24] but "have nevertheless consistently recognized that [a] fraud upon the court may only be found in the most egregious circumstances involving a corruption of the judicial process itself."[25] Similarly, we have adopted the view that the drafters of Rule 60(b) viewed fraud upon the court as referring "to very unusual cases involving far more than an injury to a single litigant."[26]

On the other hand, we have "declined to hold that an intent to defraud must invariably be proved to establish a fraud on the court" and have found recklessness to be sufficient.[27] In *Mallonee v. Grow*, for example, a party filed for a writ of execution that "grossly overstated" the amount a judgment debtor owed him, used the writ to levy upon property that the debtor did not actually own, and failed to serve legally required notice of the motion to confirm the property's sale.[28] Although we recognized that neither the party nor his attorney had "an actual intent to defraud," we nonetheless concluded that "the court has the same duty to rectify the wrong" "[w]hether the deprivation of a party's rights . . . [is] attributable to a willful intent to defraud or a reckless disregard of rules or statutory provisions."[29]

---

[24] *Id.* at 499 (quoting *Allen v. Bussell*, 558 P.2d 496, 500 (Alaska 1976)) (internal quotation marks omitted).

[25] *Id.* (alteration in original) (quoting *Lowe v. Lowe*, 817 P.2d 453, 457 n.9 (Alaska 1991)) (internal quotation marks omitted).

[26] *Id.* (quoting *Allen*, 558 P.2d at 500) (internal quotation marks omitted).

[27] *Id.* (citing *Mallonee v. Grow*, 502 P.2d 432, 438-39 (Alaska 1972); *Higgins v. Municipality of Anchorage*, 810 P.2d 149, 154 (Alaska 1991)).

[28] 502 P.2d at 438-39.

[29] *Id.*

Finally, fraud upon the court may be found even in the absence of trial counsel's involvement. In *Pumphrey v. K.W. Thompson Tool Co.*, the Ninth Circuit Court of Appeals held that a gun manufacturer's in-house counsel perpetrated a fraud upon the court when he failed to present evidence of a video-recorded test he had observed during which a gun fired when dropped on the ground.[30] The in-house counsel also neglected to raise the issue when the person who had conducted the experiment testified that the gun had never fired when dropped during testing.[31] Although the in-house counsel did not represent the gun manufacturer at trial, the court nonetheless concluded that he "engaged in a scheme to defraud."[32] Nevertheless, the general rule is that a witness's perjury, if "unassisted by the party in interest or by counsel, . . . does not amount to fraud upon the court."[33]

### 2. The trial court did not err in denying the Hernandezes' original fraud upon the court motion.

As the superior court noted, the Hernandezes' fraud upon the court claim requires "a factual inquiry into whether [Bank officers] were aware of any wrongdoing by McGrew, if so, when they became aware of it, and if their testimony and pretrial discovery square with those factual findings." We review the outcome of that inquiry for abuse of discretion.[34]

---

[30]   62 F.3d 1128, 1129-31 (9th Cir. 1995).

[31]   *Id.* at 1132.

[32]   *Id.* at 1131-32.

[33]   *State v. Alaska Cont'l Dev. Corp.*, 630 P.2d 977, 991 (Alaska 1980) (internal quotation marks omitted).

[34]   *Mallonee v. Grow*, 502 P.2d 432, 439 (Alaska 1972).

### a. The Bank's alleged knowledge of McGrew's wrongdoing

As evidence that the Bank already knew of McGrew's wrongdoing during the first *AFG* trial in June 2008, the Hernandezes presented testimony given by Bank officials during the *Christianson* litigation. Although these statements were not made until after the conclusion of the first *AFG* trial, they nonetheless shed light on knowledge the Bank may have gained about McGrew's lending practices before the first *AFG* trial.

Most notably, the Hernandezes highlighted deposition testimony from Bank senior vice president and general counsel David Lawer suggesting that Lawer knew of McGrew's improper practices as early as 2005. When Lawer was asked when he had discovered that McGrew "had violated the bank's rules," he answered, "With — within the year 2005." Lawer also described his conclusion that McGrew was "making loans [and] renewing loans at maturity to avoid identification of a borrower or borrowers who were unable to pay prior credit obligations and who currently were not creditworthy and . . . not worthy of further loans." Lawer stated that he reached this conclusion based on a review of numerous loan files — a process that may have been completed before the first *AFG* trial.[35] The Bank admits that repeated loan extensions to a borrower who is not creditworthy would, "absent some justification," violate bank policy.

The Hernandezes also highlighted the statements of Bank senior vice president David Stringer, who learned about some of McGrew's loan practices after McGrew's death in December 2004. Stringer testified that he received multiple reports from some of McGrew's former customers, who claimed they had been given loans "for the purposes of the proceeds being distributed for [someone else's] benefit." Such loans, which have their proceeds distributed to a third party rather than to the borrower, are

---

[35] Lawer testified on March 31, 2009, that he had completed his review of McGrew's loans before "the last year or so." The first *AFG* trial took place in June 2008.

sometimes referred to as "nominee loans," and McGrew's former customers told Stringer he should look to the third-party beneficiaries for repayment. Stringer testified that he "probably" received these reports between 2005 and 2007 and that he relayed them to Bank president Dan Cuddy as they arose.

Stringer also testified about information he and Cuddy acquired regarding McGrew's dealings with a particular Bank client, Kaylen LeBaron, who appeared to be receiving the proceeds from some of these nominee loans. Stringer testified that after McGrew's death, LeBaron requested a meeting with Cuddy.[36] According to Stringer's testimony, LeBaron admitted at the meeting that he was the beneficiary of numerous loans taken out on his behalf.

###### b.     The Bank's testimony and pre-trial disclosures

The Hernandezes argue that the Bank's testimony in *Christianson* reveals its representations during the first *AFG* trial to be fraudulent. But the superior court could reasonably conclude that the Bank's alleged misrepresentations, when viewed in context, did not constitute "the most egregious circumstances involving a corruption of the judicial process itself."[37]

We turn first to what is arguably the Hernandezes' most persuasive evidence of fraudulent conduct: direct discrepancies between Lawer's testimony in the *AFG* and *Christianson* cases. During a 2007 deposition before the *AFG* trial, Lawer was asked whether, "as the bank compliance officer, [he] believe[d] [McGrew] did his job relative to lending within the parameters of federal, [s]tate, and bank rules[.]" Lawer

---

[36]     Although the Hernandezes did not attribute an exact date to this meeting, LeBaron testified that he received a loan resulting from this meeting "four or five" months following McGrew's death in December 2004.

[37]     *See Murray v. Ledbetter*, 144 P.3d 492, 499 (Alaska 2006) (quoting *Lowe v. Lowe,* 817 P.2d 453, 457 n.9 (Alaska 1991)) (internal quotation marks omitted).

answered, "Yes, as far as I know." Yet Lawer later testified in *Christianson* that he acquired knowledge about McGrew's bank rule violations in 2005.

Nevertheless, we agree with the superior court that Lawer's 2007 deposition testimony, while misleading and potentially false, was not sufficiently egregious to find fraud upon the court. We have expressed caution in finding fraud upon the court based purely on the after-discovered perjury of a witness.[38] And although the Ninth Circuit has found fraud upon the court based solely on the conduct of a party's general counsel, Lawer's conduct was distinguishable from the concealment of pivotal evidence at issue in *Pumphrey*.[39] Even if Lawer misrepresented McGrew's general track record at the Bank, the misrepresentation did not directly relate to McGrew's transactions with the Hernandezes. The superior court could reasonably conclude that Lawer's testimony did not constitute a corruption of the judicial process itself.[40]

The Hernandezes also argued that Bank officials' in-court testimony misrepresented McGrew's history at the Bank. For instance, Cuddy testified that he could not think of any reason why the Hernandezes should not have trusted McGrew. Cuddy also answered affirmatively when asked if, as far as he knew, "McGrew's conduct [was] lawful in all respects." Cuddy went on to state that McGrew "was well respected in [the] bank and . . . [had] done a good job for . . . 25 years." Lawer testified at trial that

---

[38]     *See Alaska Cont'l Dev. Corp.*, 630 P.2d at 991 ("While perjury by a witness is always a cause for concern, we do not believe, even if we were to accept the state's argument that [the opposing party's witness] committed perjury, that in this case it would rise to the level of 'the most egregious conduct involving a corruption of the judicial process itself,' that we have required for a finding of 'fraud upon the court' in past cases." (quoting *Allen v. Bussell*, 558 P.2d 496, 500 (Alaska 1976))).

[39]     *See* 62 F.3d 1128, 1129-31 (9th Cir. 1995).

[40]     *See Murray*, 144 P.3d at 499.

he thought Cuddy had testified accurately, with the exception of one unrelated issue, and further characterized McGrew as a "very successful" Bank employee.

The Hernandezes contrast Cuddy's *AFG* testimony with Stringer's statements in *Christianson* that Cuddy knew about McGrew's nominee loans as early as 2005, when Cuddy began receiving Stringer's reports and met with LeBaron. The Hernandezes argue that McGrew's use of nominee loans violated both bank policy and federal law, contradicting Cuddy's characterization of McGrew's conduct as lawful. However, the Bank contends that nominee loans are "not uncommon" and are only illegal if done in a way that deceives a bank or its examiners. Because of this dispute over the legality of nominee loans, it is possible that at the time of the first *AFG* trial the Bank still lacked reason to believe that McGrew's lending practices were illegal.

Moreover, there were other reasons to discount the Hernandezes' fraud upon the court claim. Even if Cuddy's answer that McGrew's conduct was lawful in all respects was misleading, its impact on the court was lessened by Cuddy's disclaimer that he had not familiarized himself with the Hernandezes' case. Likewise, the Bank's general defenses of McGrew's character were largely subjective and likely had little impact. And because the superior court had vacated the first jury verdict on other grounds, the Hernandezes had already received the presumptive remedy for fraud upon the court: relief from judgment.[41] The superior court correctly noted that the second trial would provide the Hernandezes with "the opportunity to examine the bank officers about their knowledge of McGrew's conduct."

---

[41] *See* Alaska R. Civ. P. 60(b) (noting the "power of a court to entertain an independent action to relieve a party from a judgment, order or proceeding . . . or to set aside a judgment for fraud upon the court").

For the reasons above, the court could reasonably conclude that the alleged inconsistencies in the Bank's testimony did not rise to "clear and convincing" evidence of fraud upon the court.

> **3.     The trial court did not err in awarding the Hernandezes enhanced attorney's fees.**

While the Bank's conduct during the first *AFG* trial may not have been sufficiently egregious to constitute fraud upon the court, the superior court could reasonably conclude that testimony from the Bank's corporate officers was a bad faith attempt to minimize McGrew's misconduct, warranting enhanced attorney's fees. This court reviews "the decision to award attorney's fees for abuse of discretion and [will] overturn it only where the award is manifestly unreasonable."[42]

In particular, Lawer's 2007 deposition testimony that McGrew had done his job "within the parameters" of Bank rules may have prevented the plaintiffs from discovering the extent of McGrew's wrongdoing. And it is difficult to reconcile Lawer's 2007 testimony with his later statement that "within the year 2005" he came to "know" that McGrew had violated those rules.

As the superior court noted, "It is clear from Lawer's testimony in his *Christianson* deposition that he found out sometime in 2005 from Stringer that bank customers were making allegations against McGrew regarding nominee loans . . . ." Lawer countered in an affidavit that merely hearing "allegations by a few defaulting debtors" was insufficient to support a "reasonable belief" that McGrew had committed wrongdoing. While this reasoning may, standing alone, be sensible, it does not explain Lawer's testimony in *Christianson* that he came to "know" in 2005 that McGrew violated Bank rules.

---

[42]     *Williams v. GEICO Cas. Co.*, 301 P.3d 1220, 1225 (Alaska 2013) (citing *DeNardo v. Cutler*, 167 P.3d 674, 677-78 (Alaska 2007)).

The Bank argues that in awarding the Hernandezes enhanced attorney's fees, the superior court did not sufficiently "specify its reasons in the record."[43] We disagree. The court specifically found that "testimony given in the *Christianson* matter was at odds with testimony presented in this litigation." The court could reasonably conclude that the Bank had not adequately explained this inconsistency. Accordingly, the court did not abuse its discretion in awarding the plaintiffs their full fees for the first trial.

Nor did the court abuse its discretion in restricting its award of enhanced fees to those the Hernandezes incurred for the first trial. The superior court could reasonably conclude that the second trial offered the Hernandezes an opportunity to "present whatever evidence [they] deemed relevant and probative" regarding the Bank officers' testimony in prior proceedings. Accordingly, the Hernandezes had a chance to remedy any obfuscation resulting from the Bank's testimony in the first trial. As discussed below, moreover, the evidence that the Bank engaged in fraudulent or even misleading conduct is less compelling with respect to the second trial.

### 4. The trial court did not err in denying the Hernandezes' renewed motion for fraud upon the court.

The inconsistencies the Hernandezes rely on from the second trial are much less serious than those alleged in their original fraud upon the court motion. These inconsistencies did not require the superior court to direct judgment in their favor.

In their renewed motion, the Hernandezes highlighted the Bank's alleged knowledge of McGrew's wrongdoing by the time the second *AFG* trial commenced in

---

[43] *See Taylor Constr. Servs., Inc. v. URS Co.*, 758 P.2d 99, 102-03 (Alaska 1988) (2-2 decision) (opinion of Rabinowitz, C.J.) ("We have repeatedly recognized the trial court's broad discretion in awarding attorney's fees. We have required only that the trial court specify its reasons in the record when it departs from the fee schedule of Rule 82(a)." (citations omitted)).

November 2010. They pointed first to a report the Bank commissioned for its defense in the *Christianson* litigation, authored by Burton McCullough (the McCullough Report). The report is dated June 2009, and opines that McGrew issued illegal "nominee loans" for Christianson's benefit. The Bank intimated during the second *AFG* trial that it did not consider the report credible.

The Hernandezes next pointed to a superior court order issued in the *Christianson* case, finding that McGrew "had established a practice of using one bank customer to help the troubled loans and financial problems of other bank customers." The order also found, "Much of this lending was granted to customers who did not qualify for the loans and whose ability to pay was questionable." However, these findings did not relate to McGrew's interactions with the Hernandezes, nor did they specifically determine that McGrew acted in contravention of law or bank policy. This order may illustrate the Bank's knowledge of McGrew's misconduct with respect to Christianson by the time of the second *AFG* trial, but the superior court could reasonably conclude that such knowledge was tangential to the question of whether there was wrongdoing with respect to the Hernandezes.

The Hernandezes argue that the Bank's defense in the second *AFG* trial was nonetheless inconsistent with its admission of McGrew's wrongdoing in *Christianson*. For example, the Hernandezes cited the Bank's opening statement in *AFG*, purportedly describing "McGrew's unwillingness to engage in fraudulent conduct." Yet in this same opening statement, the Bank admitted McGrew "ben[t]" the Bank's policies and procedures in order "to give a borrower a break." This kind of admission is inconsistent with conduct "involving a corruption of the judicial process itself."[44]

---

[44] *See Murray*, 144 P.3d at 499 (quoting *Lowe v. Lowe*, 817 P.2d 453, 457 n.9 (Alaska 1991)) (internal quotation marks omitted).

The Hernandezes also highlighted Stringer's testimony during the second *AFG* trial. In particular, Stringer testified that he had "never been aware of [Bank] policies that . . . Mr. McGrew was violating," and he opined that McGrew would not have told customers that they were not required to pay back "nominee loans" for which they were the named beneficiaries. These claims were arguably inconsistent with Stringer's testimony in *Christianson* that, beginning in 2005, he began receiving reports from customers claiming that McGrew had given them nominee loans and assured them they would not be responsible for repayment. Yet even if Stringer's statements during the second *AFG* trial were inaccurate, his misrepresentations about whether he personally believed McGrew engaged in prohibited practices were not sufficiently egregious to compel a finding of fraud upon the court.

Nor did Lawer's in-court testimony during the second *AFG* trial warrant such a finding. Lawer denied having personal knowledge that McGrew contravened legal rules or Bank policies in his dealings with the Hernandezes, but conceded that McGrew might have violated Bank policies with respect to Christianson. Lawer testified that giving illegal nominee loans would be "out of character" for McGrew, but offered only equivocal statements as to whether McGrew may have engaged in criminal activity.

Unlike the Bank officers' testimony during the first *AFG* trial, these statements largely avoided sweeping pronouncements that McGrew had a blemish-free record at the Bank. And when Bank officers did testify about McGrew's general track record, they entertained the possibility that McGrew's lending practices might have violated the law or Bank policy. Accordingly, the superior court could reasonably conclude that the Bank did not commit a fraud upon the court during the second *AFG* trial.

-18- **6986**

**5. The Bank has not committed a fraud upon this court.**

The Hernandezes argue that the Bank's "misrepresentations of McGrew's conduct and presentation of false evidence" constitutes a fraud upon *this* court. The Hernandezes point out that the Bank asserted in its *Christianson* appellate briefing that McGrew had engaged in criminal conduct, contradicting the Bank's prior denials of McGrew's wrongdoing. But the Bank has not asserted to *this* court that McGrew never committed a crime, and the Hernandezes do not point to particular statements in the Bank's briefing that are fraudulent. Accordingly, we conclude the Bank has not committed a fraud upon this court.

**B. The Superior Court Did Not Err In Denying The Hernandezes' Motions For Directed Verdict And JNOV On The Issue Of Whether McGrew Acted Solely As A "Finder."**

Among the determinations the jury was asked to make in the underlying case was whether McGrew had acted solely as a "finder" with respect to the Hernandezes' investments in the Inn. As the jury instructions provided, "A national bank that acts as a finder may identify potential parties, make inquiries as to interest, introduce or arrange contacts or meetings of interested parties, act as an intermediary between interested parties, and otherwise bring parties together for a transaction that the parties themselves negotiate and consummate."[45] The instruction also listed five illustrative examples of what a finder could not engage in:

> 1) Be an agent of one party or another;
>
> 2) Broker a deal while representing only one party;
>
> 3) Make false representations as to the value or the quality of the investment;

---

[45] *See* 12 C.F.R. § 7.1002 (2014).

4) Make false recommendations as to the amount that should be invested;

5) Make false representations about the success of the investment.

Finally, the instructions advised the jurors that if they found the Bank or McGrew to have acted only as a "finder," they must find for the Bank on all of the securities claims.[46] At the conclusion of trial, the Hernandezes moved for a directed verdict that McGrew had engaged in activities that were forbidden for a "finder"; the superior court denied the directed verdict motion.

In reviewing this issue, "we apply an objective test to determine 'whether the evidence, when viewed in the light most favorable to the non-moving party, is such that reasonable [persons] could not differ in their judgment.' "[47] The Hernandezes assert that the "uncontested record" illustrates that McGrew engaged in activities forbidden for a finder. Specifically, they point to statements made by various witnesses that, in their view, tend to show McGrew made false representations as to the quality of the Inn as an investment opportunity. But even if these statements were uncontradicted, as the

---

[46] The Hernandezes' securities claims were based on the Alaska Securities Act. Federal regulations expressly permit a national bank to act as a finder, and state law may not "prevent[] or significantly interfere[] with the national bank's exercise of its powers." *Gutierrez v. Wells Fargo Bank, NA*, 704 F.3d 712, 722 (9th Cir. 2012) (quoting *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 33 (1996)) (internal quotation marks omitted); 12 C.F.R. § 7.1002(a) ("It is part of the business of banking under 12 U.S.C. 24(Seventh) for a national bank to act as a finder, bringing together interested parties to a transaction."); *see also Rose v. Chase Bank USA, N.A.*, 513 F.3d 1032, 1037 (9th Cir. 2008) ("[T]he usual presumption against federal preemption of state law is inapplicable to federal banking regulation." (citations and internal quotation marks omitted)).

[47] *Turner v. Municipality of Anchorage*, 171 P.3d 180, 185 (Alaska 2007) (alteration in original) (quoting *Wal-Mart, Inc. v. Stewart*, 990 P.2d 626, 631-32 (Alaska 1999)).

Hernandezes assert, the jurors were nonetheless free to disbelieve such testimony[48] or conclude that the alleged conduct fell within the parameters of permitted "finder" activities.

Moreover, there was substantial testimony suggesting that McGrew acted only as a finder, including expert testimony from one of the Bank's witnesses, Professor Theresa Gabaldon. At trial, Gabaldon stated, "Everything I have reviewed is entirely consistent with . . . my conclusion that [McGrew] was acting as a finder, as understood for purposes of federal banking law." Testimony from the Inn's original investors, Kirk Loeffler and Edward Cronick, provided further evidence favoring the Bank on this issue. According to Loeffler, McGrew informed him that while he could provide the contact information of potential investors, Loeffler would need to actually "sell the project" to these contacts. Cronick similarly testified that McGrew gave "suggestions" of potential investors and that the Inn was not using McGrew "as a sales agent." In light of this evidence, reasonable jurors could have reached differing conclusions on whether McGrew acted solely as a "finder."[49]

The Hernandezes argue that the prejudice they suffered from the denial of their motion for directed verdict was exacerbated by the absence of a "curative" jury instruction "that McGrew's use of nominee loans was felonious conduct." In view of our disposition on the "finder" issue, however, the jury would have been precluded from finding the Bank liable on the plaintiffs' securities claims in any event. And the

---

[48] The jury was instructed, "You may believe all or none of the testimony of any witness. You need not believe a witness even if the witness'[s] testimony is uncontradicted."

[49] The superior court also denied the Hernandezes' subsequent motion for JNOV on the "finder" issue and in the alternative, a new trial on several issues, including the securities claims. We conclude that for the same reasons as articulated above, the superior court did not err in denying this motion.

Hernandezes do not show how an instruction regarding nominee loans would have been relevant to their non-securities claims.[50] Accordingly, we are not required to decide whether the judge should have given a jury instruction regarding the legality of nominee loans.

Similarly, we need not reach the issue of whether the superior court erred in denying the Hernandezes' motion for JNOV finding certain outstanding debts to the Bank non-collectible under AS 45.55.930(g). Under this statutory provision, a person cannot sue to enforce a contract if that person had knowledge of facts which rendered the making or performance of the contract a violation of the Alaska Securities Act.[51] But the jury's conclusion that McGrew was only a "finder" relieved the Bank of liability under the Securities Act.

## C.     The Superior Court Did Not Abuse Its Discretion In Limiting The Evidence Concerning The McCullough Report.

The Hernandezes argue that the superior court erred in excluding the McCullough Report from evidence and limiting McCullough's testimony. As discussed above, the Bank retained McCullough to prepare a report for its defense in the *Christianson* litigation, and the report opined that McGrew had engaged in illegal lending activity with respect to Bank client Todd Christianson. In this case, the Bank argued that the McCullough Report was irrelevant to McGrew's interactions with the Hernandezes, and even if it were relevant for some limited purpose, the report's assertion

---

[50]     The Hernandezes do contend that the absence of an instruction regarding nominee loans "allowed jurors to more easily accept [the Bank's] repeated claims . . . that McGrew's wrongful conduct was merely minor and was undertaken only in an attempt to assist his clients." But they do not appear to argue that such an impression would have affected the jury's consideration of the non-securities claims.

[51]     AS 45.55.930(g).

that McGrew engaged in criminal wrongdoing with respect to Christianson was highly prejudicial.

The court ultimately excluded the McCullough Report and limited McCullough's testimony. Specifically, McCullough was allowed to testify that he had provided the Bank with a report concluding that McGrew had repeatedly violated both banking regulations and the Bank's policies and procedures. But he was not allowed to state his conclusion that McGrew's conduct described in *Christianson* was felonious.

A trial court's decision to admit or exclude evidence is reviewed for abuse of discretion and for prejudice to the opposing party.[52] The Hernandezes argue that the trial court was compelled to admit the McCullough Report based on our holding in *Fred Meyer of Alaska, Inc. v. Bailey*.[53] But our analysis in *Fred Meyer* did not implicate the key issue on which the trial court based its decision to limit McCullough's testimony: relevance.[54]

In *Fred Meyer*, the superior court was tasked with determining whether the defendant-employer had acted in good faith in classifying an employee as exempt from overtime under the Alaska Wage and Hour Act (AWHA).[55] In a previous lawsuit, the employer had commissioned an expert report concluding that the plaintiff-employee's

---

[52] *Cartee v. Cartee*, 239 P.3d 707, 712 (Alaska 2010) (citing *Dobos v. Ingersoll*, 9 P.3d 1020, 1023 (Alaska 2000)).

[53] 100 P.3d 881 (Alaska 2004).

[54] *See id.* at 888. In *Fred Meyer*, we discussed three evidentiary objections to the admission of an expert report: 1) that the report violated the rule limiting an opposing party's access to non-testifying expert witnesses; 2) that the report's author lacked the requisite personal knowledge for a lay witness; and 3) that the report was inadmissable hearsay. *Id.*

[55] *Id.* at 882, 887.

job position should be classified as non-exempt.[56]  Because this arguably put the employer on notice of its AWHA violation, the report was directly relevant to evaluating the employer's defense that the misclassification was in good faith.[57]

The contents of the McCullough Report, in contrast, raise relevance problems not present in *Fred Meyer*. First, the Bank did not receive the McCullough Report until 2009 — well after the events relevant to the Hernandezes' claims took place. Moreover, the report was limited to McGrew's misconduct relating to Christianson's loans and did not discuss possible misconduct with respect to the Hernandezes' transactions. According to McCullough, none of the materials he reviewed in preparing his report related to McGrew's interactions with the Hernandezes or the Inn's other investors, Cronick and Loeffler.

The superior court could therefore reasonably conclude that the report was not directly relevant to McGrew's conduct with respect to the plaintiffs. The court had considerable discretion, moreover, to limit McCullough's testimony about McGrew's criminal misconduct to avoid unfair prejudice.[58]  The limitations on McCullough's testimony were not unreasonable in view of the other evidence that the court admitted regarding McGrew's wrongdoing in the Christianson matter.

---

[56]     *Id.* at 888.

[57]     *See id.* ("[The plaintiff] did not offer the report for the truth of the matters stated; rather he offered it to show that Fred Meyer had notice of its potential violations of Alaska law." (footnote omitted)).

[58]     *See Cartee v. Cartee*, 239 P.3d 707, 712 (Alaska 2010) ("A trial court's decision to admit or exclude evidence is reviewed by us for abuse of discretion, and will be upset only if we find there has been an error which affected the substantial rights of a party." (citing *Dobos v. Ingersoll*, 9 P.3d 1020, 1023 (Alaska 2000))).

**D.     No Plain Error Resulted From The Special Verdict Form.**

The Hernandezes argue that the questions on the special verdict form led the jury to "unknowingly make a double reduction" of the Hernandezes' damage award. Absent a timely objection, we review the propriety of the special verdict form and the associated jury instructions for plain error.[59]

The special verdict form contained two questions that the Hernandezes claim may have confused the jury. Question 6 asked the jury "[w]hat amount of damages, if any, was legally caused by the [Bank's] negligence," and the jury answered "$675,000." And Question 25 asked the jury to determine the percentage of fault assigned to the Hernandezes, the Bank, and Cronick, who settled with the Hernandezes out of court. The jury determined the Bank to be 14% at fault. The Hernandezes argue that the jury understood the $675,000 figure to be *solely* attributable to the Bank's negligence and did not realize that the allocation of fault in Question 25 would reduce the amount of damages ultimately owed to the Hernandezes.

The Hernandezes are correct that Question 6 could have been framed more clearly to emphasize that it referred to their total damages. But any ambiguity in the question was directly addressed at trial, when subsequent requests for clarification confirmed that the jury correctly understood what was asked of them. First, the jury responded in the affirmative to the question, "Does your answer to Question No. 6 [damages caused by the Bank's negligence] reflect the damages you awarded to Plaintiff

---

[59]     *See Cummins, Inc. v. Nelson*, 115 P.3d 536, 541 (Alaska 2005) ("Without a timely objection, we will only review [jury] instructions for plain error. A special verdict form is a type of jury instruction subject to the same standard of review." (footnote omitted)). We note that when a timely objection has been made, we review jury instructions de novo. *Id.* Here, however, the Hernandezes point to no objection raised below, never argue that we should apply our independent judgment, and expressly assert that the trial court committed "plain error."

*before* you made any deduction based upon your answer to Question No. 25 [allocation of fault among the Bank, Cronick, and the Hernandezes]?"[60]   A second request asked the jury to re-examine its apportionment of fault "[i]n light of [its] decision that Plaintiffs are only entitled to damages based upon their claim of negligence."  The request further instructed the jury to "consider the nature of [the Bank's, Cronick's, and the Hernandezes'] conduct and the extent of the causal relationship between the conduct and any damages" the jury had identified. The jury returned the same apportionment as in their original verdict.

These interrogatories show that in answering the special verdict form, the jury properly calculated the amount of the Hernandezes' loss and then apportioned fault to take into account the degree to which the Bank, the Hernandezes, and Cronick contributed to that loss.  In light of this clarification, we conclude that no plain error resulted from the special verdict form.

E.      **The Hernandezes' Common Law Tort Claims Are Not Barred By The Statute Of Limitations.**

The Hernandezes' common law tort claims are governed by a two-year statute of limitations.[61]  "Although a cause of action generally accrues when the plaintiff incurs an injury, accrual can be delayed under . . . [the] common-law discovery rule."[62] "[T]he discovery rule may provide different possible dates on which a statute of limitations can begin to run."[63]  Generally, however, the operative date is "when the plaintiff has information which is sufficient to alert a reasonable person to begin an

---

[60]     Emphasis added.

[61]     *See* AS 09.10.070(a).

[62]     *Gefre v. Davis Wright Tremaine, LLP*, 306 P.3d 1264, 1274 (Alaska 2013).

[63]     *Id.* at 1275.

inquiry to protect his rights" — often referred to as inquiry notice.[64] Here, the Hernandezes conceded "that as of October of 2003 [they] were on 'inquiry notice'. . . as to their common law misrepresentation claims." However, the Hernandezes did not file their complaint until March 2006, after the two-year period had run.

But we have held that "[a] party who fraudulently conceals from a plaintiff the existence of a cause of action may be estopped to plead the statute of limitation if the plaintiff's delay in bringing suit was occasioned by reliance on the false or fraudulent representation."[65] Specifically, a plaintiff must show: "(1) fraudulent conduct, which may take the form of either an affirmative misrepresentation or a failure to disclose facts where there is a duty to do so; (2) justifiable reliance; and (3) damage."[66]

In the proceedings below, the Bank filed a motion for summary judgment, arguing that the Hernandezes' common law tort claims were barred by the statute of limitations. In opposition, the Hernandezes pleaded equitable estoppel, citing McGrew's alleged assurances that he would find other investors or arrange for alternative financing to get the Hernandezes out of their investment in the Inn. The court denied the Bank's motion, finding there were issues of fact "as to whether it was utterly unreasonable for Plaintiffs to not be fully aware of the falsity of McGrew's alleged misrepresentation . . . until informed so by [Bank] Vice President Stringer after McGrew's death in January 2005."

---

[64]    *Id.* (quoting *Cameron v. State*, 822 P.2d 1362, 1366 (Alaska 1991)) (internal quotation marks omitted).

[65]    *Palmer v. Borg-Warner Corp.*, 838 P.2d 1243, 1247 (Alaska 1992) (quoting *Sharrow v. Archer*, 658 P.2d 1331, 1333 (Alaska 1983)) (internal quotation marks omitted).

[66]    *Gefre*, 306 P.3d at 1277 (quoting *Williams v. Williams*, 129 P.3d 428, 432 (Alaska 2006)) (internal quotation marks omitted).

The Bank later filed a motion for directed verdict on the same grounds, which the court similarly denied, first noting that it is the judge who determines whether the elements of estoppel have been satisfied, acting "as a factfinder in determining the applicability of the statute of limitations." The court found that McGrew made misrepresentations to the Hernandezes and that the Bank "knew about the weaknesses of the project" but did nothing to stop McGrew from refinancing it. Accordingly, the court concluded that the Hernandezes' reliance on McGrew's misrepresentations was not "utterly unreasonable." The Bank filed a motion for JNOV on the same grounds, which the court summarily denied.

### 1. The superior court applied the correct burden of proof to determine the elements of equitable estoppel.

The Bank contends the superior court should have required the Hernandezes to prove each element of equitable estoppel by "clear and convincing evidence." But the Bank relies on our application of this standard in real estate cases where the application of equitable estoppel divests title from one party and transfers it to another.[67] Where title to land is at issue, the stricter standard serves to "foster reliance on record title and enhance marketability."[68] But these policy concerns do not apply here, and we have never required "clear and convincing evidence" to prove equitable estoppel in the context of a statute of limitations defense. We decline to do so now.

The Bank also takes issue with the superior court's application of the "utterly unreasonable" standard this court articulated in *Palmer v. Borg-Warner*

---

[67] *See, e.g.*, *Dressel v. Weeks*, 779 P.2d 324, 329 (Alaska 1989).

[68] *See Curran v. Mount*, 657 P.2d 389, 391 (Alaska 1982) (adopting the clear and convincing standard for adverse possession cases).

*Corporation*.[69] As we have noted, "a party should be charged with knowledge of the fraudulent misrepresentation or concealment only when it would be utterly unreasonable for the party not to be aware of the deception."[70] Once it is utterly unreasonable not to know about the deception, the plaintiff must take timely action or risk losing the protection of equitable estoppel.[71]

The Bank contends that the "utterly unreasonable" standard is only applicable "in cases of fraudulent concealment of a claim." Yet the "utterly unreasonable" standard as we have articulated it expressly applies to "fraudulent misrepresentation,"[72] which is precisely what the Hernandezes alleged. We conclude that the superior court correctly applied the "utterly unreasonable" standard in this case.

---

[69]     838 P.2d at 1251.

[70]     *Id.*; *see also Waage v. Cutter Biological Div. of Miles Labs., Inc.*, 926 P.2d 1145, 1149 (Alaska 1996).

[71]     *Palmer*, 838 P.2d at 1251.

[72]     *Waage*, 926 P.2d at 1149.

**2.    The superior court reasonably concluded that the Bank's defense was barred by equitable estoppel.**

The issue of whether equitable estoppel applies is a question of law that we review de novo.[73]  However, the elements of equitable estoppel involve questions of fact,[74] which we review for clear error.[75]

The Bank asserts there was insufficient evidence to support the superior court's finding that "McGrew failed to adequately make necessary disclosures and made misrepresentations to [the Hernandezes], such that they continued to work with him and [the Bank]." But the Hernandezes attested that "[e]ach time McGrew advanced funds to the Hernandez family members he would repeat that this was going to work and that as soon as the hotel was finished he could find other investors to take the Hernandez family completely out."  McGrew allegedly made such representations in October and December of 2003, and in January, April, May, and October of 2004.  According to the Hernandezes, McGrew also stated that he would combine the Hernandezes' various loans into a single "wrap around" loan secured by the completed Inn.

The Bank does not appear to argue on appeal that the Hernandezes' recounting of their conversations with McGrew is inaccurate.  Rather, the Bank contends that these statements were not "misrepresentations," but merely promises that were never performed.  We have noted that "[a] statement made as to future intentions and actions

---

[73]    *Ogar v. City of Haines*, 51 P.3d 333, 335 (Alaska 2002) (citing *Hubbard v. Hubbard*, 44 P.3d 153, 155 (Alaska 2002)).

[74]    *See, e.g.*, *Palmer*, 838 P.2d at 1251 ("The determination of when a fraudulent misrepresentation or concealment should have been discovered is a question of fact for the trial court to decide." (citing *Carter v. Hoblit*, 755 P.2d 1084, 1087 (Alaska 1988))).

[75]    *Shumway v. Betty Black Living Trust*, 321 P.3d 372, 375 (Alaska 2014).

is not a misrepresentation if it is accurate when it is made, even if future events render it inaccurate."[76] But the Bank does not point to any evidence that McGrew intended to perform on his promise, such as an indication that McGrew was actively searching for another investor or had the capacity to divest the Hernandezes of their responsibility for the project. The Bank does point out that the Hernandezes *believed* McGrew was seeking replacement financing, but this does not show that McGrew actually intended to do so. Accordingly, it was not clearly erroneous for the superior court to conclude that McGrew's reassurances were "misrepresentations."

The Bank also makes two arguments as to why, as a matter of law, McGrew's statements could not be considered misrepresentations. The first is that McGrew's promise to divest the Hernandezes of their investment was unenforceable under the Statute of Frauds, since certain types of financing or loans in excess of $50,000 must be in writing.[77] But the provision the Bank cites applies only to "an agreement to lend . . . or to grant or extend credit"[78] and therefore does not apply to McGrew's promises to *divest* the Hernandezes of their financial responsibility for existing loans. The Bank also argues that McGrew's assurances were merely speculative promises regarding a third party's actions and thus could not have been misleading as a matter of law. However, McGrew also allegedly told the Hernandezes that if they helped him finish building the Inn, *he* would help them by "find[ing] an investor to take over the project." Thus, McGrew was taking personal responsibility for an outcome he failed to provide, and accordingly, such a promise could constitute a misrepresentation.

---

[76] *Valdez Fisheries Dev. Ass'n v. Alyeska Pipeline Serv. Co.*, 45 P.3d 657, 672 (Alaska 2002).

[77] *See* AS 09.25.010(a)(13).

[78] *Id.*

In its order denying the Bank's motion for directed verdict, the superior court also found that "in light of the bank's tacit support of McGrew's actions," the Hernandezes were not "utterly unreasonable" in relying on McGrew's "continued misrepresentations to allay their suspicions."

As an initial matter, the Bank argues that the Hernandezes have never provided evidence that they *actually* relied on McGrew's assurances. But the Hernandezes' reliance may be inferred from the nature of McGrew's assurances and evidence that the Hernandezes continued to sign loan documents after their discussions with McGrew.

The Bank also argues that reliance on McGrew's assurances would have been unreasonable. In particular, the Bank asserts it was unreasonable for the Hernandezes to rely on statements about potential financing that contained no details regarding amount, source, or terms. As the superior court noted, however, McGrew was a "long-time friend and trusted loan officer." And even testimony from the Bank's own officers confirmed that the Hernandezes should have had no reason not to trust McGrew. Accordingly, it was not "utterly unreasonable" for the Hernandezes to rely on McGrew's assurances that he would secure new financing for the Inn.

**F.     The Issue Of Whether An Interest In An LLC Is A Security Is Moot.**

The Bank argues that the superior court erred in ruling that the Hernandezes acquired a "security" interest in the Inn, within the meaning of the Alaska Securities Act. The court made this finding when it denied the Bank's motion for summary judgment on the Hernandezes' securities claims. But the jury ultimately found that McGrew acted only as a "finder," thus relieving the Bank of any liability under the Alaska Securities

Act.[79]  Therefore our determination of this issue would have no direct bearing on the outcome of this litigation.

"Under ordinary circumstances, we will refrain from deciding questions where events have rendered the legal issue moot.  A claim is moot if it is no longer a present, live controversy, and the party bringing the action would not be entitled to relief, even if it prevails."[80]  But under the collateral consequences exception, we may decide a case that is otherwise moot where "a judgment may carry indirect consequences in addition to its direct force, either as a matter of legal rules or as a matter of practical effect."[81]

The Bank contends that the superior court's security interest finding has "important collateral consequences" for the Bank.  Because its insurer withdrew coverage and defense since its policy did not cover "any claims arising out of efforts to promote the sale of a security," and because policy disputes under the insurance policy are submitted for binding arbitration, the Bank claims that the superior court's decision may "unfairly prejudice the arbitrators" or be considered dispositive in the future coverage dispute.

---

[79]    *See* 12 C.F.R. § 7.1002(a) ("It is part of the business of banking under 12 U.S.C. 24(Seventh) for a national bank to act as a finder, bringing together interested parties to a transaction."); *see also Gutierrez v. Wells Fargo Bank, NA*, 704 F.3d 712, 722 (9th Cir. 2012) (noting that state law may not "prevent or significantly interfere with the national bank's exercise of its powers." (citation and internal quotation marks omitted)).

[80]    *Fairbanks Fire Fighters Ass'n, Local 1324 v. City of Fairbanks*, 48 P.3d 1165, 1167 (Alaska 2002) (alteration omitted) (quoting *Gerstein v. Axtell*, 960 P.2d 599, 601 (Alaska 1998)) (internal quotation marks omitted).

[81]    *In re Mark V.*, 324 P.3d 840, 843 (Alaska 2014) (quoting *In re Joan K.*, 273 P.3d 594, 598 (Alaska 2012)) (internal quotation marks omitted).

We disagree. The mere possibility of "unfairly prejudic[ing] the arbitrators" is insufficient to compel resolution of an otherwise moot issue. And the Bank presents no legal authority explaining how the superior court's interlocutory finding would preclude an arbitration panel from reaching its own independent conclusion on this question of law. A court's resolution of an issue has preclusive effect only if that issue is essential to the final judgment, and other courts are not bound by interlocutory findings that are not essential to a final judgment.[82] Accordingly, the superior court's finding that the Hernandezes acquired a security interest in the Inn will not be controlling in the Bank's insurance coverage arbitration because that finding was not essential to the final judgment.

We therefore conclude that this issue is moot and that the collateral consequences exception does not apply.

### G. The Superior Court Did Not Err In Determining That The Hernandezes Were Entitled To Attorney's Fees And Costs.

In the proceedings below, the superior court determined that the Hernandezes were the prevailing party and awarded them attorney's fees and costs. The Bank appeals this award on several grounds.

#### 1. The Bank's deeds of trust did not preclude the superior court from awarding attorney's fees to the Hernandezes.

The Bank first argues that the award of attorney's fees and costs in this case was governed by contract — namely, the deeds of trust securing the Bank's loans to the Hernandezes. The Bank points to the following provision in its deeds of trust:

---

[82] *See* RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. h (1982) ("If issues are determined but the judgment is not dependent upon the determinations, relitigation of those issues in a subsequent action between the parties is not precluded. Such determinations have the characteristics of dicta, and may not ordinarily be the subject of an appeal by the party against whom they were made.").

> If [the Bank] institutes any suit or action to enforce any of the
> terms of this Deed of Trust, [the Bank] shall be entitled to
> recover such sum as the court may adjudge reasonable as
> attorneys' fees at trial and upon any appeal. Whether or not
> any court action is involved or pending, and to the extent not
> prohibited by law, all reasonable expenses [the Bank] incurs
> that in [the Bank's] opinion are necessary at any time for the
> protection of its interest or the enforcement of its rights shall
> become a part of the indebtedness payable on demand and
> shall bear interest at the Note rate . . . .

The Bank contends this suit required it to "protect and enforce" its right to repayment of the Hernandezes' loans, and the superior court was therefore required to grant the Bank attorney's fees and costs for its defense.

We have held that "where a contract between the parties allows for one party to recover attorney's fees in the event of litigation, the contract provision must prevail" over the general rule that the prevailing party in a civil case is awarded attorney's fees.[83] Accordingly, an attorney's fees provision in the Bank's deeds of trust would arguably govern here. We interpret the relevant contract provision applying our independent judgment.[84] "In interpreting a contract, the object is to give effect to the reasonable expectations of the parties. To ascertain these expectations, the court looks

---

[83] *O'Connell v. Will*, 263 P.3d 41, 47 (Alaska 2011) (quoting *Rockstad v. Erikson*, 113 P.3d 1215, 1224 (Alaska 2005)) (internal quotation marks omitted); *see also* Alaska R. Civ. P. 82(a) ("Except as otherwise provided by law or agreed to by the parties, the prevailing party in a civil case shall be awarded attorney's fees calculated under this rule.").

[84] *See Casey v. Semco Energy, Inc.*, 92 P.3d 379, 382 (Alaska 2004) (citing *Old Harbor Native Corp. v. Afognak Joint Venture*, 30 P.3d 101, 104 (Alaska 2001)).

to the language of the disputed provision, the language of other provisions of the contract, relevant extrinsic evidence, and case law interpreting similar provisions."[85]

The first sentence of the excerpt above states only that the Bank will be entitled to reasonable fees in any suit the Bank "institutes" to enforce the deed of trust. But this suit was brought by the Hernandezes, and the Bank did not bring a counterclaim to enforce the deed of trust. Therefore, this provision is inapplicable.

The Bank seems to rely on the second sentence of the quoted language, which allows "all reasonable expenses" necessary to protect the Bank's interest to be added to the note by "becom[ing] a part of the indebtedness payable on demand," "[w]hether or not any court action is involved or pending." Accordingly, the Bank may indeed be entitled to add certain litigation expenses to the indebtedness owed on the Hernandezes' notes. But the Bank did not counterclaim to enforce its notes, nor are we reviewing any judicial or nonjudicial proceeding to collect on the "indebtedness payable." It would therefore defy the "reasonable expectations" of the parties[86] to grant the Bank its litigation expenses outside of a proceeding to collect on the Hernandezes' notes.

Because the attorney's fees provision in the parties' contractual agreement is inapplicable to the present dispute, the civil rules control.

### 2. The superior court did not err in finding that the Bank's offers of judgment were invalid under Civil Rule 68.

The Bank argues that it made valid offers of judgment that were significantly higher than the Hernandezes' recovery at trial, thus rendering the Bank the

---

[85] *Peterson v. Wirum*, 625 P.2d 866, 872 n.10 (Alaska 1981) (citation omitted).

[86] *See id.*

prevailing party under Civil Rule 68. Rule 68 encourages settlement[87] by providing that if a party makes an offer of judgment that is rejected, the rejecting party must pay attorney's fees and costs if the final judgment "is at least 5 percent less favorable" than the rejected offer.[88] However, "[a]n offer not in compliance with Rule 68 may not be considered in determining costs and attorney's fees."[89] "Whether an offer of judgment complies with Civil Rule 68 is a question of law that we review using the independent judgment standard."[90]

The Bank's offer presented two recovery options to the Hernandezes: (1) the sum of $230,000, plus interest; or (2) 105% of $212,167.67, Alaska Civil Rule 79 costs, and interest. Under either of these two options, however, $100,000 of this amount was to "be paid by offset against the principal of one or more" of three loans owed to the Bank: one belonging solely to Alaska Fur Gallery, one shared between Alaska Fur Gallery and Hernandez & Associates, and one shared between Alaska Fur Gallery and the Inn. Additionally, the offer provided that, with the exception of one particular loan, the Hernandezes would be "discharged from their payment guarantees" for the Inn's outstanding loans. However, the offer also listed four loans that would be "confirmed as being valid and enforceable liabilities of the plaintiffs." In total, the principal on these loans exceeded $5 million.

---

[87] *Pagenkopf v. Chatham Elec., Inc.*, 165 P.3d 634, 644 (Alaska 2007).

[88] Alaska R. Civ. P. 68(a), (b). If there are multiple defendants, the threshold is ten percent rather than five percent. Alaska R. Civ. P. 68(b).

[89] *Grow v. Ruggles*, 860 P.2d 1225, 1227 (Alaska 1993).

[90] *Anderson v. Alyeska Pipeline Serv. Co.*, 234 P.3d 1282, 1286 (Alaska 2010).

We agree with the superior court that this offer was invalid. First, both options were joint offers, which are usually invalid as Rule 68 offers of judgment due to apportionment difficulties.[91] In determining whether a joint offer may nonetheless be valid, we consider two factors: (1) whether "[t]he settlement offer clearly indicated all claims between the parties would be resolved if the offer were accepted"; and (2) whether apportionment difficulty actually exists.[92]

While the Bank's offer may satisfy the first factor in that it would have resolved all of the plaintiffs' claims, "apportionment difficulty" indeed exists here. The Bank points out that Alaska Fur Gallery and Hernandez & Associates are both owned by members of the Hernandez family, who stated during trial that they did not see the two entities as "distinct." But the offer of judgment not only required a lump sum to be apportioned between these two plaintiffs, but also implicated several different loans — one of which was held jointly by Alaska Fur Gallery and the Inn. Accordingly, it was not clear how the $100,000 "offset" against the loan principal would be apportioned or which of the three plaintiffs would reap the benefit of that principal reduction.[93]

---

[91]     *See Brinkerhoff v. Swearingen Aviation Corp.*, 663 P.2d 937, 943 (Alaska 1983).

[92]     *John's Heating Serv. v. Lamb*, 46 P.3d 1024, 1042 & n.85 (Alaska 2002) (alteration in original) (citation and internal quotation marks omitted).

[93]     The Bank contends that the Inn should not be considered a plaintiff for purposes of the Rule 68 offer because it had no individual claim aside from those raised by the Hernandezes, and because the court instructed the jury that the word "plaintiff" or "plaintiffs" in the instructions referred to Alaska Fur Gallery and Hernandez & Associates. However, the Bank itself referred to the Inn as a separate party in its offer of judgment, and the Bank provides no authority as to why the Inn is not a relevant party for Rule 68 purposes.

Finally, even if the Bank's offer were valid under Rule 68, it is unclear that it is a better offer than what the Hernandezes received from the final judgment. The offer contains a condition that the plaintiffs confirm the validity of over five million dollars in loans. The litigation did not satisfy that condition: while the final judgment in this case may not have relieved the Hernandezes of their debt obligations, it did not affirmatively confirm their loans as "valid and enforceable liabilities." In this sense, it would be incorrect to say that the Bank's offer — "confirming" millions of dollars in debt liability with approximately $230,000 in compensation — was better than the plaintiffs' recovery at trial.

### 3. The superior court did not abuse its discretion by concluding that the Hernandezes were the prevailing party.

The Bank argues that it was the prevailing party, based on its defeat of numerous claims and the small size of the Hernandezes' award compared to the total damages sought. A superior court's prevailing party determination is reviewed for abuse of discretion.[94]

As we have held,

> For purposes of awarding fees pursuant to Civil Rule 82, the general rule is that the prevailing party is the one who has successfully prosecuted or defended against the action, the one who is successful on the main issue of the action and in whose favor the decision or verdict is rendered and the judgment entered.[95]

---

[94] *Progressive Corp. v. Peter ex rel. Peter*, 195 P.3d 1083, 1092 (Alaska 2008) (citing *Interior Cabaret, Hotel, Rest. & Retailers Ass'n v. Fairbanks N. Star Borough*, 135 P.3d 1000, 1002 (Alaska 2006)).

[95] *Day v. Moore*, 771 P.2d 436, 437 (Alaska 1989) (quoting *Adoption of V.M.C.*, 528 P.2d 788, 795 n.14 (Alaska 1974)) (internal quotation marks omitted).

"[A] party does not have to prevail on all the issues in the case to be a 'prevailing party.' "[96]  "With few exceptions, the party who obtains an affirmative recovery is considered prevailing."[97]

Here, the Hernandezes prevailed on their negligence claim, and recovered $94,500 in damages, plus interest.  Based on this affirmative recovery, the superior court could reasonably conclude that the Hernandezes were the prevailing party.

**4.      The superior court did not err by declining to apportion costs.**

The Bank argues that the superior court erred in awarding the Hernandezes 100% of their costs, given the jury's verdict that the Bank was only 14% at fault for the Hernandezes' damages.  The Bank requested a modified cost bill that would have apportioned only 14% of the Hernandezes' costs to the Bank, but the superior court denied that request.  The court concluded, and the Hernandezes argue on appeal, that Civil Rule 79(h) only applies to apportionment among multiple non-prevailing parties. Because this issue involves the interpretation of the civil rules, we review this question de novo.[98]

Civil Rule 79(h) states:  "In a case in which damages are apportioned among the parties under AS 09.17.080, costs must be apportioned and awarded according to the provisions of Civil Rule 82(e)."  Rule 82(e) provides:  "In a case in

---

[96]      *Id.* (quoting *Malvo v. J.C. Penney Co.*, 512 P.2d 575, 586 (Alaska 1973)).

[97]      *Alaska Ctr. for the Env't v. State*, 940 P.2d 916, 921 (Alaska 1997) (citing *Hillman v. Nationwide Mut. Fire Ins. Co.*, 855 P.2d 1321, 1327-28 (Alaska 1993)).

[98]      *See E.P. v. Alaska Psychiatric Inst.*, 205 P.3d 1101, 1106 (Alaska 2009) ("We . . . review questions of statutory interpretation *de novo*."); *City of Kodiak v. Parish*, 986 P.2d 201, 202 (Alaska 1999) (applying independent judgment to the interpretation of Rule 82(e)); *Ford v. Municipality of Anchorage*, 813 P.2d 654, 655 (Alaska 1991) ("Since this case involves the interpretation of a civil rule, we exercise our independent judgment.").

which damages are apportioned among the parties under AS 09.17.080, the [attorney's] fees awarded to the plaintiff under (b)(1) of this rule must also be apportioned among the parties according to their respective percentages of fault." And the fee schedule in Rule 82(b)(1) requires the court to calculate attorney's fees based on the judgment and, if awarded, the prejudgment interest.

We have previously held that "the fit between Rule 79(h) and Rule 82(e) is snug."[99] When "Rule 82(e) does not apply with regard to attorney's fees, . . . the same conclusion must follow with respect to Rule 79(h) costs."[100] And because Rule 82(b)(1) calculates attorney's fees based on the final judgment awarded to the prevailing party — not the claimant's total injury before apportionment — attorney's fees calculated under Rule 82(b)(1) will already have been reduced to reflect any fault attributed to the plaintiff or to non-parties. Where there is only one non-prevailing party, no further reduction is necessary. Accordingly, Rule 82(e) apportionment should only occur if there are multiple non-prevailing parties to the litigation.

Here, although the jury found that the Hernandezes, the Bank, and Cronick all shared fault to the varying degrees, the Bank was the only non-prevailing party, and the final judgment against the Bank reflected the Bank's percentage of fault: 14%. Because the Bank was the only non-prevailing party against whom the jury awarded damages, the court correctly determined that Rule 82(e) did not apply; further apportionment of the attorney's fee award would result in a double reduction to that award. And because Rule 82(e) did not apply, Rule 79(h) was also inapplicable. We therefore conclude that the superior court did not err by declining to apportion costs.

---

[99]    *Parish*, 986 P.2d at 204.

[100]    *Id.*

## V.    CONCLUSION

We AFFIRM the superior court's judgment in all respects.